In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-1318

FYRNETICS (HONG KONG) LIMITED and
WALTER KIDDE PORTABLE EQUIPMENT, INC.,

*Plaintiffs-Appellants,*

*v.*

QUANTUM GROUP, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99-CV-04704—**Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 6, 2001—DECIDED JUNE 18, 2002

Before COFFEY, KANNE, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* Fyrnetics Hong Kong ("FHK") and
Walter Kidde Portable Equipment Inc. ("Kidde") sued
Quantum Group, Inc., alleging that Quantum sold FHK
defective carbon monoxide ("CO") sensors, thereby causing
Kidde to recall CO detectors made using the allegedly de-
fective sensors. Quantum filed a motion to dismiss the
complaint, or in the alternative to stay the action under 9
U.S.C. § 3, asserting that various agreements between the
parties required the stay in favor of arbitration. The district
court held an evidentiary hearing on the matter and sub-
sequently entered judgment dismissing FHK and Kidde's

claims in favor of arbitration pursuant to one agreement. We affirm in part and remand in part.

## I. Background

Quantum is a technology firm based in San Diego, California that manufactures CO detectors using a biomimetic sensor that it developed and patented. In June 1996, Quantum entered into a license agreement effective January 1, 1997 with Fyrnetics.[1] Pursuant to this agreement, Fyrnetics was licensed to "make, have made, use, import, export, sell or offer to sell" CO detectors containing Quantum's patented sensor technology. In return for this license, Fyrnetics agreed to pay to Quantum royalties of two and one-half percent of its gross CO detector sales. Around the same time, Quantum entered into a manufacturing agreement with FHK whereby FHK manufactured Quantum's brand of CO detectors using Quantum's patented CO sensor technology. Pursuant to the manufacturing agreement, the finished CO detectors were to be sold by FHK exclusively to Quantum for resale to Quantum's clients.

In relevant part, the license agreement between Fyrnetics and Quantum provided that "[a]ny claim or controversy arising between the parties hereto in connection with this Agreement . . . shall be determined by arbitration to be held in accordance with the rules of the American Arbitration Association . . . ." The license agreement also granted Fyrnetics "the right to sublicense its Affiliates . . . [e]ach Affiliate so sublicensed shall be bound by the terms and conditions of this Agreement." The term "Affiliate" was defined as entities that control or were controlled by Fyrnetics, or had common ownership with Fyrnetics. At all

---

[1] In 1998, Fyrnetics was merged with Kidde and subsequently dissolved as a separate corporate entity.

relevant times, Fyrnetics and FHK were considered "Affiliates" pursuant to the terms of the license agreement. This is so because when the license agreement was first entered into both Fyrnetics and FHK were owned by the same holding company, Management Investment & Technology International, Inc. ("MIT"). Later, FHK and Fyrnetics remained "Affiliates" when Williams Holding (International) Limited ("Williams") purchased the stock of FHK, and Kidde, a subsidiary of Williams, purchased the stock of Fyrnetics.

In July 1999, FHK and Kidde filed a complaint, alleging that during late 1997 and early 1998, Quantum sold defective CO sensors to FHK. Kidde and FHK sounded their complaint in tort, alleging that Quantum committed misrepresentation and negligence and that Quantum breached certain warranties with regard to the sensors. Additionally, FHK and Kidde alleged that FHK sold to Fyrnetics CO detectors made using the defective sensors, and Fyrnetics in turn resold the detectors in Canada and the United States. Because of the allegedly defective sensors, Kidde claimed that many of the CO detectors that Fyrnetics sold in the United States and Canada failed. Consequently, Kidde was forced to engage in a costly recall of the faulty CO detectors. Thus, in their complaint Kidde and FHK sought to recoup all compensatory and consequential damages suffered as a result of Quantum's allegedly tortious actions.

Quantum moved to dismiss FHK and Kidde's complaint or to stay the action under 9 U.S.C. § 3, arguing that provisions in the Quantum-FHK manufacturing agreement[2] and provisions in the Quantum-Fyrnetics license agreement mandated the stay in favor of arbitration. The

_____

[2] The district court found that manufacturing agreement to be irrelevant to the present dispute.

district court denied Quantum's motion to dismiss, finding that an issue of fact existed as to whether the parties were acting pursuant to either the manufacturing agreement, the license agreement, or an alleged oral agreement, which FHK and Kidde asserted controlled the parties' relationship. The district court then held an evidentiary hearing to decide this issue.

At the evidentiary hearing, FHK and Kidde called Thomas Russo to testify. In 1996, when Quantum and Fyrnetics entered into their license agreement, Russo was the president and CEO of Fyrnetics. During this same time period, Russo was also the managing director of FHK. Russo testified that the Quantum-Fyrnetics license agreement either never went into effect or was abandoned. According to Russo, in December 1996, he and Dr. Mark Goldstein, President and CEO of Quantum, reached an oral agreement, allowing FHK to purchase CO sensors from Quantum directly and then to manufacture CO detectors for resale to Fyrnetics. Therefore, Russo asserted that in late 1997 and early 1998, when the allegedly defective sensors were sold to FHK, Quantum and FHK were acting pursuant to this oral agreement and not the license agreement, which contained the arbitration provision.

On cross-examination, Russo was confronted with multiple memoranda and letters between the parties referencing the license agreement. For example, on January 7, 1997, Quantum's attorney, Peter Leal, wrote Kidde's attorney, Byron Gregory, and stated that if Fyrnetics were sold to Kidde, Quantum would require that Kidde agree to be bound by the license agreement. Gregory responded and explained that the transactions were being structured as a sale of stock. Therefore, he further explained, because no sale of business or asset transaction would be occurring, it was unnecessary for Kidde to attain Quantum's consent to use Quantum's patented sensor technology. As a second example, on January 24, 1997, Kidde and Fyrnetics exe-

cuted a share purchase agreement that specifically disclosed to Kidde the license agreement as a current asset of Fyrnetics. No evidence was presented at the evidentiary hearing by FHK or Kidde to corroborate Russo's testimony about the existence of an oral contract.

Goldstein testified on behalf of Quantum, stating that at all relevant times, the parties' business relationship and the sale of CO sensors to FHK was governed by the license agreement. Goldstein asserted that there was not another agreement that gave either FHK or Fyrnetics the right to use Quantum's patented technology. Goldstein further denied reaching an oral agreement with Russo and denied agreeing to any abandonment of the license agreement. Rather, Goldstein explained that in late 1997 and early 1998, when the allegedly defective senors were sold to FHK, Fyrnetics was allowing its affiliate, FHK, to manufacture the CO detectors on its behalf pursuant to the license agreement.

On August 7, 2000, the district court dismissed FHK and Kidde's complaint in favor of arbitration. The district court explained that "[e]ven though Russo testified, and the plaintiffs maintain, that the License Agreement was a dead letter, documents confirm that [Fyrnetics] was treating the Agreement as alive and well as late as June 1997." Moreover, the district court explained that the fact that the royalty rate paid by Fyrnetics and then by Kidde to Quantum was the same as the rate set out in the license agreement (two and one-half percent) further supported its conclusion that the parties were acting pursuant to the license agreement. The district court determined that the license agreement permitted Fyrnetics to sublicense any "Affiliate," and that the license agreement passed to Kidde as part of Kidde's acquisition of Fyrnetics. Thus, the district court concluded "that in purchasing the CO sensors and other components from Quantum for use in the CO detectors sold to Fyrnetics and Kidde, FHK was acting as Fyrnetics' sub-

licensee under the license agreement," which contains the arbitration clause.

In January 2001, the district court denied FHK and Kidde's subsequent motion for reconsideration and reaffirmed its order dismissing FHK and Kidde's claims. In this denial, the district court further explained that it "rejected as lacking in credibility the testimony of Thomas Russo . . . that in purchasing the CO sensors, FHK was acting pursuant to a verbal understanding with Quantum rather than pursuant to the written [license] agreement."

## II. Analysis

FHK and Kidde present several arguments on appeal. First, they contend that the district court erred when it disregarded their version of the events. They continue to insist that the license agreement was abandoned or, alternatively, never went into effect and that an alleged oral agreement controlled the parties' relationship. Second, they argue that even if the license agreement was effective, neither Kidde nor FHK can be bound by it because neither of them was party to the license agreement. Finally, they contend that even if the license agreement is binding upon them, the current dispute should not be governed by the license agreement as it does not arise in connection with or pursuant to a claimed breach of the license agreement.

### A.  Standard of Review

To the extent we review the actual language of an arbitration provision, we will review the district court's determinations *de novo*; however, "to the extent that the district court's order is based upon factual findings, our review is guided by the clearly erroneous standard." *Nordin v. Nutri/System, Inc.*, 897 F.2d 339, 344 (8th Cir. 1990).

### B. The License Agreement

On appeal, FHK and Kidde initially assert that the district court erred when it determined that the parties were acting pursuant to the license agreement, rather than the alleged oral agreement. By means of an evidentiary hearing, the district court determined that no oral agreement existed. In making this determination, the district court relied on the correspondence between the parties, the existence of a written license agreement between the parties, and the fact that both Fyrnetics and Kidde paid a two and one-half percent royalty to Quantum as set out in the written license agreement. In contrast, the only evidence presented that supported FHK and Kidde's oral agreement theory was Russo's testimony, and the district court determined that that testimony was incredible. In reviewing the district court's factual determination, we will apply a clearly erroneous standard of review, and if the district court's account of the evidence "is plausible in light of the record viewed in its entirety," we will not reverse the district court even if we are convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently. *Anderson v. Bessemer City*, 470 U.S. 564, 573-74, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985). Moreover, special deference will be given to the district court's "findings based upon credibility determinations, which can virtually never be clear error." *United State v. Hickok*, 77 F.3d 992, 1007 (7th Cir. 1996) (quotation omitted).

With respect to the existence of an oral contract, the district court did not believe Russo's contention that after the execution of an 18-page license agreement, Goldstein would orally agree to sell Quantum's patented biomimetic sensor technology. While on appeal FHK and Kidde argue that there is evidence to the contrary, the trial court believed Quantum's version of the events. Given the written agreement, the correspondence between the parties, the royalty payments, and the district court's determination

that Russo's testimony was lacking in credibility, we believe that the district court correctly concluded that there was no oral agreement.

Similarly, in *McMahon Food Corp. v. Burger Dairy Co.*, 103 F.3d 1307, 1313 (7th Cir. 1996), the trial court concluded that McMahon Food failed to act in good faith, a finding of fact reversed only for clear error. On appeal, McMahon Food argued that it presented evidence to the contrary to the trial court. *See id.* Affirming the trial court, this court explained that McMahon Food's argument "amount[ed] to nothing more than an argument that the trial court should have believed [McMahon Food's] version of events rather than [the opposing party's version]." *Id.* There, "the trial court specifically found that McMahon [Food's] testimony was less credible than the testimony of [the opposing party]." *Id.* Similarly, here, the trial court found that Russo's testimony was less credible than Goldstein's testimony.

FHK and Kidde also contend that the district court's rationale for finding that the license agreement was effective and not abandoned was baseless. Supporting the district court's conclusion are communications from 1997 and 1998 between the parties that suggest that the license agreement controlled the parties' relationship. For example, on November, 24, 1997, Russo wrote to Goldstein expressing a concern that Quantum was violating the license agreement by selling in one of the markets designated to Fyrnetics. While this allegation proved unfounded, the fact that Russo wrote to Goldstein in November 1997 on behalf of Fyrnetics and referenced the license agreement solidifies the district court's finding that the license agreement was effective and not abandoned. Russo did not dispute the existence of the communications between the parties, but rather offered alternative interpretations of and explanations for them. However, the district court believed Goldstein's version of the events. Given this evidence demon-

strating the plausibility of Goldstein's version of the events, we cannot say that the district court clearly erred by concluding that no oral agreement existed, and that the license agreement was effective and not abandoned. *See Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

## C. Binding a Non-signatory

Next, FHK and Kidde contend that even if the license agreement was effective at the time the defective sensors were sold to FHK, FHK and Kidde cannot be bound by the arbitration provision in the license agreement because neither party signed the license agreement.

### 1. Kidde

With respect to Kidde, we believe that the district court correctly determined that Kidde's claims, in essence, were derivative of Fyrnetics', a signatory to the license agreement, because Kidde was Fyrnetics' successor. The allegedly defective sensors were sold during late 1997 and early 1998, and Fyrnetics existed as a separate corporate entity during this time period. As the district court correctly explained, in June 1998, "[w]hen Kidde caused Fyrnetics to be merged into Kidde and then dissolved, Kidde voluntarily assumed the obligation of Fyrnetics' license agreement. . . . Kidde, which is making claims that are partly those of Fyrnetics, cannot escape application of the license agreement's arbitration requirement by effectively legislating Fyrnetics out of existence."

### 2. FHK

With respect to FHK, the district court correctly explained that there are several ways that a non-signatory

can be bound by a contract, such as through the doctrines of assumption, agency, equitable estoppel, veil piercing, and incorporation by reference. *See Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999). Relying on the doctrine of assumption, the district court explained that FHK evidenced its assumption of the license agreement through its payment of royalties to Quantum at the two and one-half percent rate as set out in the license agreement. As FHK highlights on appeal, however, no evidence was presented to the district court that FHK actually paid *any* royalties to Quantum. Rather, the parties presented evidence that Fyrnetics and then Kidde, but not FHK, paid the two and one-half percent royalty rate. Further, the district court relied solely on this incorrect factual determination to bind FHK to the license agreement, and the record is devoid of other evidence supporting this conclusion. The district court clearly erred in making this factual determination and therefore, in the absence of other factual findings to support the district court's conclusion that FHK assumed the license agreement, we must remand to the district court to further reexamine this issue. Through further findings, FHK might prove to have assumed the license agreement or prove to be bound through one of the other alternative theories for binding a non-signatory. *See id.* (discussing theories).

## D. *Arising Under the License Agreement*

Finally, Kidde argues that even if the license agreement is in effect, their claims are not governed by the license agreement because their claims do not arise in connection with the license agreement or with a claimed breach of the license agreement. We will address this issue of contract interpretation *de novo. See Keifer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999). As we consider Kidde's contention, we bear in mind that "once it is

clear the parties have a contract that provides for arbitration of some issues between them, any doubts concerning the scope of the arbitration clause are resolved in favor of arbitration." *Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir. 1998). Moreover, "a court may not deny a party's request to arbitrate an issue unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Keifer*, 174 F.3d at 909 (quotation omitted).

The arbitration provision in this case contemplated that "[a]ny claim or controversy arising between the parties hereto in connection with this Agreement . . . shall be determined by arbitration." This court has characterized similar provisions as extremely broad and capable of an expanse reach. *See id.* at 909-10. In *Keifer*, the relevant arbitration provision stated that "[a]ny controversy or claims arising out of or relating to [the Agreements] shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association." *Id.* at 909. There, we noted that "[b]road arbitration clauses . . . necessarily create a presumption of arbitrability." *Id.* at 910. We believe that such a presumption arises in this case given the expansive language of the arbitration provision in the Quantum-Fyrnetics license agreement and its similarity to the provision in *Keifer*.

Kidde seems to imply that because its claims arose exclusively from Quantum's allegedly tortious conduct, its claims arise in tort and therefore should not be bound by contract terms. It is nonsensical for Kidde to argue that its claims are not arising "in connection with the license agreement." The license agreement specifically permitted Fyrnetics and then Kidde "to make, have made, use, import, export, sell, or offer to sell" products containing Quantum's CO sensor. Fyrnetics sold CO detectors using CO sensors that Kidde now alleges were defective. The fact that Kidde cast its complaint in tort does not allow it to avoid its

contractual obligation to arbitrate. *See Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 643 (7th Cir. 1993) ("We have routinely held that a party may not avoid a contractual arbitration clause merely by 'casting its complaint in tort.'").

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court in part and we REMAND in part for findings with respect to the issue of whether FHK, a non-signatory to the license agreement, is bound to arbitrate.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*