Robert FAZIO, et al., Plaintiffs,

v.

LEHMAN BROTHERS, INC., et al., Defendants.

Samuel Glazer, Plaintiff,

v.

Lehman Brothers, Inc., et al., Defendants.

Dominic A. Visconsi, et al., Plaintiff,

v.

Lehman Brothers, Inc., et al., Defendants.

Peter A. Spitalieri, et al., Plaintiff,

v.

Lehman Brothers, Inc., et al., Defendants.

Richard Lopardo, et al., Plaintiff,

v.

Lehman Brothers, Inc., et al., Defendants.

Thomas J. Savoca, et al., Plaintiff,

v.

Lehman Brothers, Inc., et al., Defendants.

Peter M. Bonutti, Plaintiff,

v.

Lehman Brothers, Inc., et al., Defendants.

Nos. 1:02CV157, 1:02CV370, 1:02CV382, 1:02CV761, 1:02CV764, 1:02CV968, 1:02CV1018.

United States District Court, N.D. Ohio, Eastern Division.

July 19, 2002.

Douglas V. Bartman, Kahn, Kleinman, James J. Bartolozzi, Kahn, Kleinman, Cleveland, OH, H. Nicholas Berberian, Neal, Gerber & Eisenberg, Chicago, IL, P. Benjamin Duke, Covington & Burling, New York City, Christopher M. Ernst, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Christopher P. Fisher, Ulmer & Berne, Cleveland, OH, Philip A. Irwin, Covington & Burling, New York City, Mark R. Jacobs, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, OH, Mar-

vin L. Karp, Ulmer & Berne, Cleveland, OH, John S. Kluznik, Sr., Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Mark P. O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Charna E. Sherman, Squire, Sanders & Dempsey, Cleveland, OH, Laurence A. Silverman, Covington & Burling, New York City, Mark E. Staib, Hahn, Loeser & Parks, Cleveland, OH, Brian A. Troyer, Jones Day, Cleveland, OH, Michael N. Ungar, Ulmer & Berne, Cleveland, OH, Gary L. Walters, Squire, Sanders & Dempsey, Cleveland, OH, David C. Weiner, Squire, Sanders & Dempsey, Cleveland, OH, Elin B. Young, Ulmer & Berne, Cleveland, OH, for defendants.

Ari H. Jaffe, Kohrman, Jackson & Krantz, Cleveland, OH, Byron S. Krantz, Kohrman, Jackson & Krantz, Cleveland, OH, Steven R. Malynn, Kohrman, Jackson & Krantz, Cleveland, OH, for plaintiffs.

## MEMORANDUM OF OPINION

MANOS, District Judge.

In each of these cases, the Defendants have filed motions to compel arbitration and stay proceedings.[1] (*See* Fazio Docket Nos. 38, 48 and 54; Glazer Docket Nos. 26 and 36; Visconsi Docket Nos. 23 and 35; Spitalieri Docket Nos. 11 and 12; Lopardo Docket Nos. 13 and 17; Savoca Docket Nos. 12 and 16; Bonutti Docket No. 13.) The parties have briefed these issues extensively. The arbitration issues overlap sufficiently to permit the Court to issue a single opinion applicable to all these cases.

For the following reasons, the motions to compel arbitration and stay proceedings are DENIED.[2]

## I. FACTS

These actions arise out of the conduct of Frank Gruttadauria, who formerly acted as an investment broker for each of the Plaintiffs. He is charged with stealing from the investment accounts he was servicing over a period of approximately fifteen years, and covering up his activity by providing false account statements to the Plaintiffs.

The Plaintiffs have sued the brokerage firms for which Gruttadauria worked over the period of the alleged theft. Generally, the Plaintiffs assert that the brokerages are liable for his conduct. They have brought fraud claims under the federal securities laws, including Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j(b)) and S.E.C. Rule 10(b)(5), as well as related claims under state law.

Viewing the cases collectively, the brokerage defendants include Lehman Brothers, Inc. and certain affiliated companies (collectively "Lehman"); SG Cowen Securities Corp., its predecessor Cowen & Company, and its parent Societe Generale (collectively "SG Cowen"); and Hambrecht & Quist, Inc., now known as J.P. Morgan Securities, Inc., and its parent J.P. Morgan Chase & Co. (collectively "J.P. Morgan").

The Defendants allege that the Plaintiffs executed various agreements governing their brokerage accounts. These agreements were presented to the Plaintiffs in connection with the accounts to be serviced by Gruttadauria, and allegedly require that all disputes arising out of account activity be resolved through arbitration. The agreement allegedly executed between

---

[1] For convenience, the Court will refer to each case by the last name of the first Plaintiff.

[2] Some of these motions also seek dismissal of certain claims pursuant to Fed.R.Civ.P. 12(b)(6). These issues will be addressed in separate opinions.

Plaintiff Robert Fazio and S.G. Cowen's predecessor is representative:

> Any controversy arising out of or relating to any of [Fazio's] accounts, to transactions with [Cowen] for [Fazio's], or to this or any other agreement or the construction, performance or breach thereof, shall be settled by arbitration before an arbitration panel appointed by the NASD or the New York Stock Exchange, Inc. or the American Stock Exchange, Inc. as [Fazio] may elect.

(*See* Motion of SG Cowen, Fazio Docket No. 38, at 3.) Although there may be minor differences among the agreements signed by the various Plaintiffs, they all contain an arbitration provision comparable to that quoted above.

The Defendants assert that the arbitration provisions govern all issues raised in these cases. They, therefore, seek a stay of all court proceedings and an order compelling the Plaintiffs to submit to arbitration. The Plaintiffs essentially argue that the arbitration provisions should not be enforced because Gruttadauria's conduct was far outside the contemplation and foreseeability of the parties at the time the account agreements were executed.

## II. *LAW AND ANALYSIS*

The Federal Arbitration Act ("FAA") provides in relevant part:

> A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Once a court determines that issues in litigation are subject to arbitration, the court proceedings must be stayed until the arbitration process is complete. 9 U.S.C. § 3.

█ Courts have characterized the FAA as expressing a congressional policy favoring enforcement of arbitration provisions. Doubts regarding such provisions should be resolved in favor of arbitration. *Southland Corp. v. Keating*, 465 U.S. 1, 10–13, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) These principles apply to arbitration provisions contained in agreements governing brokerage accounts. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 480–83, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–21, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir.2000), *cert. denied*, 531 U.S. 1148, 121 S.Ct. 1088, 148 L.Ed.2d 963 (2001); *Ferro Corp. v. Garrison Industries, Inc.*, 142 F.3d 926, 932 (6th Cir.1998).

█ Enforcement of an arbitration clause, however, has limits. First, the dispute at issue must be within the scope of the arbitration provision. *Stout*, 228 F.3d at 714. A party cannot be forced to arbitrate issues for which there was not an agreement to do so, and the parties intentions control. *Sandvik AB v. Advent International Corp.*, 220 F.3d 99, 105 (3d Cir.2000); *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 27 (2d Cir.1995); *Three Valleys Municipal Water District v. E.F. Hutton & Company, Inc.*, 925 F.2d 1136 (9th Cir.1991); *Roney & Co. v. Kassab*, 981 F.2d 894, 897

(6th Cir.1992). In addition, an arbitration provision will not be enforced if it resulted from conduct that would provide for revocation of the contract. *McMahon,* 482 U.S. at 226, 107 S.Ct. 2332; *Ferro,* 142 F.3d at 932.

In support of arbitration, the Defendants rely on a body of cases beginning with *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). *Prima Paint* dealt with a situation in which the party opposing arbitration alleged fraudulent inducement to enter the contract. The Supreme Court held that if the alleged fraud pertains to the contract *as a whole,* then the issue of fraudulent inducement must be decided as part of the arbitration process. On the other hand, a fraud claim should be decided by the court if the alleged fraudulent inducement is directed at the agreement to arbitrate *specifically.* In essence, the alleged agreement to arbitrate is effectively considered a separate agreement which may be valid despite being contained in an otherwise fraudulently induced contract. *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *see also Burden v. Check Into Cash of Kentucky, LLC,* 267 F.3d 483, 488 (6th Cir.2001), *cert. denied,* 535 U.S. 970, 122 S.Ct. 1436, 152 L.Ed.2d 380 (2002); *Ferro,* 142 F.3d at 931, 933.

■ As shown in the cases cited by the parties, *Prima Paint* has been applied generally to challenges based upon the making of the contract. The analysis proceeds upon the following principles. First, there must be a valid and enforceable contract which includes an obligation to arbitrate disputes. Second, the scope of the arbitration obligation must include the dispute at issue. Third, if the claim is for fraudulent inducement to enter the agreement as a whole, then the disputed issues must be decided by arbitration. If, however, the claim is for fraudulent inducement of the agreement to arbitrate, then the disputed issues are for the Court to decide because the alleged fraud goes to the very legitimacy of the arbitration procedure.

■ The Court concludes that the Defendants have misapplied *Prima Paint* and its progeny. Those cases apply only to situations in which a party seeks to avoid or rescind an existing contract. It does not apply to challenges to the very existence of the contract on the ground that there was never an agreement at all. *Three Valleys,* 925 F.2d at 1140–41 (whether a contract's signatory had authority to bind a party is a question for the court); *Sandvik,* 220 F.3d at 106 (court must decide whether the underlying agreement containing the arbitration clause exists). An arbitration obligation cannot arise out of a broader contract if the broader contract never existed. *Burden,* 267 F.3d at 488. To avoid arbitration based on the ground that a contract never actually existed, the substance of any alleged misrepresentation must go to its character or essential terms. *Id.* at 490, *citing,* Restatement (Second) of Contracts § 163 cmt. a (1979).

■ Here, assuming the Plaintiffs executed the account agreements, they did so with the understanding and expectation that Gruttadauria would act as their broker. He allegedly, however, never had any intention to do so, but rather only intended to steal their money. Because the intentions of the parties differed drastically, there was never any meeting of the minds, both as to the contract as a whole, *and as to the arbitration clause specifically.* Thus, an enforceable contract never existed. In *Prima Paint,* the alleged fraud centered around the circumstances under which the contract was executed. In contrast, in the current cases the al-

leged fraud goes beyond just the execution of the account agreements, but goes to the very nature of the relationship. Under the Plaintiffs' allegations, there never really was a broker/investor relationship, so the account agreements are entirely void *ab initio*, including the arbitration provisions.

In this vein, several of the Plaintiffs note that the arbitration provisions relate only to "accounts". They argue that those provisions do not apply because there never were any "accounts" as that term is understood in the brokerage industry. The Court agrees. The plain meaning of "account" in this context is essentially a pool of assets either invested or maintained by the brokerage in cash accounts. Here, the Plaintiffs'· assets for the most part were neither invested nor maintained as cash, but stolen. Accordingly, there effectively were no accounts, and the alleged agreements are therefore unenforceable against the Plaintiffs.[3]

■ Even assuming the existence of valid account agreements, *Prima Paint* and its progeny still do not apply because such cases only apply upon the threshold finding that the disputes at issue fall within the scope of the arbitration provisions. Even absent any contractual defects, parties cannot be compelled to arbitrate disputes outside the scope of an arbitration provision. If the Court concludes that claims based upon outright theft are not encompassed by the arbitration provisions here, then the analysis set forth in *Prima Paint* never arises as an issue.

Generally, the underlying basis for the Plaintiffs' claims is Gruttadauria's alleged theft of their assets. They argue that despite the breadth of the arbitration provisions, claims based upon the outright theft of assets are outside the scope. They rely heavily on an unreported Ohio appellate decision, *Cohen v. PaineWebber, Inc.*, 2002 WL 63578 (Hamilton Cty.App. January 18, 2002). Like here, the plaintiff in *Cohen* sued a brokerage firm based upon allegations that a broker had stolen assets from a brokerage account. The account agreement required arbitration of "any and all controversies" relating to the account. The court held that claims based on theft were not within the scope of the arbitration clause:

> Although the arbitration provision is broad, stating that it covers any and all controversies pertaining to the brokerage account, we cannot say, as a matter of law, that a claim alleging such tortious conduct as the aiding and abetting of a theft is subject to the arbitration provision here. An arbitration clause itself is a contract. A contract requires a meeting of the minds as to the terms contained within. At the time that the parties entered into the contract, there was no meeting of the minds that the arbitration provision would cover claims alleging tortious forms of theft. If the parties had contemplated, at the time that they entered into the arbitration agreement, that PaineWebber would possibly steal from Ginsburg, that would surely be against public policy. Matters more likely to have been contemplated by both parties would have involved questions of whether a particular trans-

---

**3.** The Court recognizes that many of the Plaintiffs make additional arguments as to why particular account agreements are invalid. Such arguments include, for example, that certain account agreements were never signed, that signatures were actually forged, and/or that the agreements pertain to accounts or transaction categories not at issue.

If demonstrated, these arguments would provide additional bases for concluding that the arbitration provisions are invalid and unenforceable. Because the general principles governing contracts and arbitration clauses render the provisions at issue ineffective, the Court need not address each and every specific argument raised by the Plaintiffs.

action was authorized or whether there was any miscalculation in the sum of money contained in the account. Here, the claims filed by Cohen alleged that PaineWebber and Wilhelm had engaged in conduct beyond the scope of the brokerage agreement. Zenni, allegedly with the knowledge of PaineWebber and Wilhelm, had sent altered and false monthly account statements to Ginsburg. Accordingly, under the stated circumstances in this case, we hold that, as a matter of law, the claims of unlawful conversion and fraudulent concealment, were not subject to the arbitration provision.

*Id.* at *3. Although *Cohen,* an unreported Ohio appellate decision, is not binding, this Court concurs with its reasoning. Conduct amounting to theft is so beyond what is expected from a broker that such conduct could not have been within the reasonable contemplation of the Plaintiffs when they signed the alleged account agreements.

Recognizing that *Cohen* is not binding, the Defendants argue that the decision should be disregarded because it goes against the weight of long-standing case law favoring arbitration. The Court disagrees with the Defendants' characterization of *Cohen* as an aberration. The Plaintiffs assert tort claims such as fraud, conversion, theft, and breach of fiduciary duty. *Cohen* is the only case cited by the parties in which tort claims were brought based upon broker theft. In other contexts, however, Courts have considered the broader issue of whether tortious conduct is within the scope of broad, contractual arbitration clauses. Thus, *Cohen* is not an aberration, but merely constitutes one example of the broader issue of applying contractual arbitration clauses to tort claims.

 Tort claims are subject to a contractual arbitration provision if based on factual allegations that fall within the scope of the provision. *Fyrnetics (Hong Kong) Limited v. Quantum Group, Inc.,* 293 F.3d 1023, 1030 (7th Cir.2002) (designated for publication); *Gregory v. Electro-Mechanical Corp.,* 83 F.3d 382, 384 (11th Cir.1996); *Carib Aviation and Marine Consultants, Ltd. v. Mitsubishi Aircraft International, Inc.,* 640 F.Supp. 582, 588 (S.D.Fla.1986). Tort claims are outside the scope of the arbitration provision if they can be asserted independently without reference to the contract. *Ford v. NYLCare Health Plans of Gulf Coast, Inc.,* 141 F.3d 243, 250 (5th Cir.1998) (applying comparable Texas law). Applying these principles, courts in many cases have determined that tort claims are outside the scope of arbitration clauses of breadth comparable to that at issue here.

For example, in *Telecom Italia, SpA v. Wholesale Telecom Corp.,* 248 F.3d 1109 (11th Cir.2001), the defendant brought a third party complaint against an entity from which it leased telecommunications circuits. The lease agreement called for arbitration of "any dispute arising out of or relating to this service agreement". The defendant alleged that the third party tortiously interfered and conspired to undermine its relationship with the plaintiff. The court (quoting a commentator) stated that "parties to an arbitration agreement should be compelled to arbitrate only those torts contemplated by the arbitration agreement." *Id.* at 1114. In determining whether the tort claims were subject to arbitration, the court considered whether the claims were the "immediate, *foreseeable* result of the performance of contractual duties". There, the tort claims were not arbitrable because the third party's conduct extended far beyond the reasonable expectations of the contracting parties. *Id.* at 1116–17 (emphasis added).

In *Ford, supra,* a physician entered into a medical services contract with an HMO. The contract had a provision requiring arbitration of all disputes "arising out of or relating to" the agreement. Dissatisfied with the way the HMO was advertising medical services, the physician brought suit for false advertising under the Lanham Act. The court concluded that, although the terms and polices set forth in the medical services contract were relevant, the competitive injuries alleged under the false advertising claims rendered such claims outside the scope of arbitration. The false advertising claims were wholly independent from the existence of the contract. *Ford,* 141 F.3d at 252.

Similarly, in *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20 (2d Cir.1995), the parties executed a contract for the purchase of goods. In addition to claims arising from allegations of non-payment, the plaintiff brought a defamation claim asserting that the defendant made defamatory comments about the quality of the plaintiff's products to one of its customers. The underlying contract contained a broad arbitration provision applicable to "any controversy or claim arising under or in relation to this order or contract". The issue was whether the defamation claim was within the scope of the arbitration clause. The court recognized that resolution of the defamation claim would necessitate examining evidence relevant to the contract claims. The court concluded, however, that the defamation claim was not subject to arbitration because such a claim was beyond the parties reasonable expectations, and never contemplated, at the time the contract was executed. *Id.* at 28–29.

In *Sutton v. Hollywood Entertainment Corp.,* 181 F.Supp.2d 504 (D.Md.2002), the parties executed an agreement by which the plaintiff could rent movie videos from the defendant's store. There was an arbitration clause applicable to "any dispute arising out of or relating in any way to Applicant's relationship with HOLLYWOOD VIDEO". On March 1, 2001, an employee of the defendant incorrectly identified the plaintiff as the man who robbed the store the previous evening. The plaintiff was arrested and detained, but later was exonerated after a review of the store surveillance video revealed that he was not the perpetrator. He brought suit for false imprisonment, malicious prosecution, and negligence. The court reasoned that the "relationship" referenced in the agreement meant the "relationship as a video renter". The court concluded that it was "logically untenable" that the video membership agreement was contemplated to cover claims arising out of accusations of theft. The claims, therefore, were not subject to arbitration. *Id.* at 510–12.

Finally, in *Hersman, Inc. v. Fleming Companies, Inc.,* 19 F.Supp.2d 1282 (M.D.Ala.1998), *aff'd,* 180 F.3d 271 (11th Cir.1999), the plaintiff hired the defendant to oversee the development of a shopping center. As part of the project, they selected an architect and the parties executed an architectural agreement. It required that all "claims, disputes, or other matters in question . . . arising out of or relating to this Agreement" be submitted to arbitration. Ultimately, the plaintiff brought suit asserting negligence and fraud in connection with the defendant's oversight of the project. The court concluded that the tort claims were not subject to arbitration because the plaintiff's allegations were independent of the obligations imposed by the architectural agreement. *Id.* at 1286–87.

These cases stand for the general proposition that tort claims are not subject even to a broad arbitration clause if the conduct at issue was beyond any reasonable foreseeability or contemplation at the time the contract was executed. Under these prin-

ciples, *Cohen* was decided correctly and applies to this case.

Except for *Cohen*, the cases cited by the Defendants demonstrate the types of improper conduct that are reasonably foreseeable in a brokerage relationship. The cases involve such conduct as unauthorized trades, executing risky or poor investments inconsistent with an investor's stated investment objectives, generally failing to follow instructions, and "churning" (excessive trading for the purpose of artificially increasing commissions). What these activities have in common is that they stem from trading activity generally within the scope of employment of a broker. When an investor opens an account, it is at least reasonably foreseeable that disputes may arise concerning the propriety of certain trading activity. Such conduct can be subjected to arbitration regardless of how the claims are legally fashioned, be they, for example, framed as common law fraud, breach of fiduciary duty, statutory securities fraud, or even R.I.C.O.

On the other hand, an investor does not open a brokerage account contemplating the possibility that the assets might be stolen outright. The Plaintiffs' claims are outside the scope of the arbitration provisions because they arise out of alleged activity far beyond any conduct reasonably foreseeable or contemplated from a brokerage relationship. In addition, such claims are independent of any account agreements because they could be asserted even if there had never been any written account agreements.

### III. *CONCLUSION*

Stated plainly, when the Plaintiffs signed the alleged account agreements, they had no reasonable concern or contemplation that their assets would be stolen. There was, therefore, never any meeting of the minds with respect to any portion of the alleged account agreements, including the arbitration provisions. In addition, claims arising from allegations of outright theft are beyond the scope of such arbitration provisions. Accordingly, the Defendants' motions to compel arbitration and stay proceedings are DENIED.

IT IS SO ORDERED.