# In the
# United States Court of Appeals
## For the Seventh Circuit
————————

No. 04-2383

LINDA JAMES,

*Plaintiff-Appellant,*

v.

MCDONALD'S CORPORATION,
SIMON MARKETING, INCORPORATED,
and ANTE ENTERPRISES LLC, doing
business as MCDONALD'S RESTAURANT,

*Defendants-Appellees.*

————————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 C 2791—**Matthew F. Kennelly**, *Judge.*

————————

ARGUED JANUARY 7, 2005—DECIDED AUGUST 2, 2005

————————

Before POSNER, RIPPLE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Linda James filed this action in the
United States District Court for the Western District of
Kentucky alleging state law contract and tort claims against
McDonald's Corporation, Simon Marketing, Inc. and the
owner-operators of two McDonald's restaurants (collec-
tively "McDonald's"). The action was transferred to the
Northern District of Illinois, under 28 U.S.C. § 1407(a), as

part of the *In re McDonald's Corporation Promotional Game Litigation*, No. 1437, multi-district proceeding. The district court granted McDonald's motion to compel Ms. James to arbitrate her claims and to stay judicial proceedings pending the outcome of arbitration. Ms. James did not pursue arbitration; instead, nearly a year later, she asked the district court to reconsider its order. The district court denied the motion and later dismissed the case for failure to prosecute. Ms. James has appealed. For the reasons set forth in the following opinion, we now affirm the judgment of the district court.

# I
# BACKGROUND
## A.

In 2001, McDonald's was promoting sales of its food products by sponsoring a game called "Who Wants to be a Millionaire." Ms. James obtained a game card in May of 2001 when she purchased an order of french fries at the drive-thru window of a McDonald's restaurant in Franklin, Kentucky. She believed the game card to be a grand prize winner worth one million dollars. In order to redeem her prize, Ms. James sent in the original game card to the McDonald's redemption center. On June 14, 2001, however, the redemption center sent her a letter explaining that, "[t]hrough security codes on your Game Card we have been able to determine that it is a Low-level Prize Game Card. Low-level prizes included food prizes and $1 to $5 in cash." R.1.

In August 2001, the Federal Bureau of Investigation arrested eight employees of Simon Marketing who allegedly had stolen the winning game cards from the "Who Wants to

be a Millionaire" game and another McDonald's promotion. Ms. James filed suit alleging that McDonald's induced her to purchase its food products by the chance to win the "Who Wants to be a Millionaire" game when it knew that, due to the theft of winning game cards, the odds of winning were less than represented. She also alleged that, as part of its fraud scheme, McDonald's had used a false pretense to refuse to honor her winning game card.

McDonald's filed a motion to compel Ms. James to arbitrate her claims. It relied on an arbitration clause contained in the rules for the "Who Wants to be a Millionaire" game ("Official Rules"), which stated:

> Except where prohibited by law, as a condition of participating in this Game, participant agrees that (1) any and all disputes and causes of action arising out of or connected with this Game, or any prizes awarded, shall be resolved individually, without resort to any form of class action, and exclusively by final and binding arbitration under the rules of the American Arbitration Association and held at the AAA regional office nearest the participant; (2) the Federal Arbitration Act shall govern the interpretation, enforcement and all proceedings at such arbitration; and (3) judgment upon such arbitration award may be entered in any court having jurisdiction.

R.1, Ex.A at 12. McDonald's presented evidence, credited by the district court, that the Official Rules were posted openly in participating restaurants. The rules were posted near the food counter, on the back of in-store tray liners and near the drive-thru window. Also, the french fry cartons to which game cards were affixed had language directing participants to see the Official Rules for details.

**B.**

On February 4, 2003, the district court granted McDonald's motion to compel Ms. James to arbitrate her claims. Applying Kentucky law, the district court concluded that Ms. James could not avoid the arbitration clause by claiming that she never saw or read the Official Rules. Next, the court determined that arbitration, not the court, was the appropriate forum for resolving Ms. James' claim that the arbitration clause should not be enforced because McDonald's fraudulently had induced her to participate in the game. This was because the alleged fraud related to the entire contract, as opposed to the agreement to arbitrate in particular. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403 (1967). Finally, the district court found unavailing Ms. James' claim that it should not enforce the arbitration clause because the costs of arbitration were prohibitive. The district court noted that *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000), and the other cases upon which Ms. James relied, concerned a party's ability to pursue federal statutory claims. In contrast, Ms. James submitted no authority to support the proposition that prohibitive costs could defeat an agreement to arbitrate common law or state law claims.

Despite the district court's order, Ms. James did not file a demand for arbitration. At a status hearing held in August 2003, her counsel informed the district court that Ms. James had not initiated arbitration because she could not afford to advance the necessary costs. On December 15, 2003, Ms. James' counsel explained that Ms. James still had not proceeded to arbitration due to the costs. At that time, counsel requested the district court to transfer the case back to the Western District of Kentucky. Counsel sought to file in the transferor court a motion for reconsideration of the district court's order compelling arbitration. The district

court denied the motion on the ground that granting it would defeat the purpose of the multi-district litigation process. The district court set a deadline of January 15, 2004, for Ms. James to file any requests for reconsideration.

On January 15, 2004, Ms. James filed a motion for reconsideration; in the alternative, she requested that her case be dismissed "so that she may exercise her right of appeal." R.28 at 9. The district court denied the motion as untimely. In essence, the court explained that Ms. James merely reiterated her original arguments and was "not entitled to forego arbitration, wait nearly a year, and only then seek reconsideration." R.32 at 3. The court further held that, even if the motion was deemed timely, it had no merit. Among other things, the court explained that no genuine factual issue existed as to whether a contract was entered:

> Ms. James has not contradicted the factual showing made by McDonald's that the french fry carton that contained her game piece made specific reference to the contest rules and told her what she needed to do to review them. Her only contention is that she did not actually see the rules. Under the circumstances, this amounts to a claim that she did not read the rules even though they were clearly and undisputably identified to her as being part of the contest.

*Id.* at 4. In concluding its order, the district court expressed that "[i]t is clear from the events since our February 2003 order that James does not intend to pursue her claim in arbitration." *Id.* at 6. Therefore, the court granted Ms. James one week to file a motion to show cause why her case should not be dismissed for failure to prosecute in arbitration.

Three weeks later, Ms. James filed a one-page submission containing the same arguments previously raised. The

district court concluded that Ms. James "will not pursue the case in the manner the court has ruled the law requires. This amounts to a failure to prosecute." R.34 at 1. Accordingly, the court dismissed Ms. James' case with prejudice.

## II

## ANALYSIS

### A. Standard of Review

We review a district court's decision, under the Federal Arbitration Act ("FAA"), to compel parties to arbitrate their disputes de novo. *See Fyrnetics (Hong Kong) Ltd. v. Quantum Group, Inc.*, 293 F.3d 1023, 1027 (7th Cir. 2002). We review the district court's findings of fact for clear error. *Id.*

### B. Arbitration

Ms. James contends that the district court erred by ordering her to submit her claims to arbitration on three grounds: (1) that she did not enter into a valid agreement to arbitrate her claims; (2) that she cannot afford the costs of arbitration; and (3) that the contract is invalid because it was induced by fraud.

#### 1. Agreement to Arbitrate

The FAA provides that a "written provision in any . . . contract . . . to settle by arbitration" any future controversy arising out of such contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in

equity for the revocation of any contract." 9 U.S.C. § 2.[1] The FAA was designed "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place [them] on the same footing as other contracts." *Gilmer v. Interstate/ Johnson Lane Corp.*, 500 U.S. 20, 24 (2000). The FAA embodies a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Any doubts with respect to arbitrability therefore should be resolved in favor of arbitration. *Id.*

However, a party can be compelled to arbitrate only those matters that she has agreed to submit to arbitration. *First Options of Chicago Inc. v. Kaplan*, 514 U.S. 938, 945 (1995); *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997) ("An agreement to arbitrate is treated like any other contract. . . . If there is no contract there is to be no forced arbitration." (internal quotation and citation omitted)). In deciding whether the parties agreed to arbitrate a certain matter, federal courts generally should rely on state contract law governing the formation of contracts.

---

[1]  Section 2 of the FAA provides in full:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

*First Options of Chicago Inc.*, 514 U.S. at 944.[2]

Ms. James contends that she should not be forced to arbitrate her claims because she never entered into an agreement to arbitrate her dispute. She submits that she was not aware of the Official Rules, much less that the rules deprived her of a jury trial. For the same reasons, Ms. James contends that, if there was an agreement to arbitrate, it is unconscionable and should not be enforced. To support her position, Ms. James submits that one cannot assume that she knew of, and accepted, the arbitration clause in the Official Rules simply because she ate at a McDonald's restaurant. She maintains that customers cannot be expected to read every container of food they purchase in order to know that they are entering a contract. Rather, she submits that it was McDonald's burden to assure her understanding of, and willingness to be bound by, the arbitration provision.

Certainly, as Ms. James urges, a contract includes only terms on which the parties have agreed. *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1450 (7th Cir. 1996). However, one of the things that Ms. James agreed to by participating in the "Who Wants to be a Millionaire" game was to follow the game's rules in order to win the promised prize. As a general rule, a participant in a prize-winning contest must comply with the terms of the contest's rules in order to form a valid and binding contract with the contest promoter. The promoter's obligation is limited by the terms of the offer,

---

[2] The parties dispute whether Kentucky or Illinois law applies in this case. *See* Appellant's Br. at 9-10; Appellee's Br. at 13-14. However, neither party argues, nor do we conclude, that the outcome of this case would be different depending on which law we apply. The principles of contract construction in this case are "matters of hornbook law." *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1061 n.1 (11th Cir. 1998).

including the conditions and rules of the contest that are made public.[3]

Ms. James challenges the district court's reliance on Kentucky case law that provides that a party who had the opportunity to read a contract, but did not, is bound by the contract terms. *Merten v. Vogt*, 208 S.W.2d 739, 740 (Ky. 1948); *Conseco Fin. Serv. Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. Ct. App. 2001). Ms. James insists that these cases are inapposite because they involve contracts that were negotiated and signed by the parties. Instead, she relies on *Oakwood Mobile Homes, Inc. v. Sprowls*, 82 S.W.3d 193, 199 (Ky. 2002), which held that an employee could not validly agree to arbitrate without "actual notice" of the employer's arbitration policy. The district court's ruling is not inconsistent with *Oakwood*, however, because the court found that the Official Rules were "clearly and undisputably identified to [Ms. James] as being part of the contest." R.32 at 4. It is axiomatic that a contest normally has rules regarding eligibility to win the promised prize. Moreover, Ms. James cannot claim, on the one hand, that a valid contract obligates McDonald's to redeem her prize and, on the other hand, argue that no contract binds her to the contest rules. A con-

---

[3] *See, e.g.*, *Workmon v. Publishers Clearing House*, 118 F.3d 457, 459 (6th Cir. 1997); *Barnes v. McDonald's Corp.*, 72 F. Supp. 2d 1038, 1042-43 (E.D. Ark. 1999), *aff'd*, 230 F.3d 1362 (8th Cir. 2000) (unpublished); *Nat'l Amateur Bowlers, Inc. v. Tassos*, 715 F. Supp. 323, 325 (D. Kan. 1989); *Johnson v. BP Oil Co.*, 602 So. 2d 885, 888 (Ala. 1992); *Harlem-Irving Realty Inc. v. Alesi*, 425 N.E.2d 1354, 1357 (Ill. App. Ct. 1981); 1 E. Allan Farnsworth, Farnsworth on Contracts § 3.10, at 260-62 & n.34 (3d ed. 2004); 1 Richard A. Lord, Williston on Contracts § 4.3, at 360 (1990); Michael P. Sullivan, Annotation, *Private Contests and Lotteries: Entrants' Rights and Remedies*, 64 A.L.R. 4th 1021 (1988).

test participant cannot pick and choose among the terms and conditions of the contest; the rules stand or fall in their entirety.

Outside the promotional-contest context, this court has held that parties are bound to an arbitration provision even if they did not read the provision. For instance, in *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir.), *cert. denied*, 522 U.S. 808 (1997), the purchasers of a computer conceded that they had noticed the terms printed inside the box in which their computer was shipped. However, they maintained that they had not read it closely enough to see the arbitration clause. *See id.* at 1148. We held that the arbitration clause was enforceable because the purchasers had the opportunity to return the computer after reading the terms. We stated that "[a] contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome." *Id.*; *see also ProCD*, 86 F.3d at 1452 (binding consumer to arbitration clause printed inside box of software because consumer had the opportunity to return the software after reading the terms). In *Hill*, we explained that

> [p]ractical considerations support allowing vendors to enclose the full legal terms with their products. Cashiers cannot be expected to read legal documents to customers before ringing up sales. If the staff at that the other end of the phone for direct-sales operations such as Gateway's had to read the four-page statement of terms before taking the buyer's credit card number, the droning voice would anesthetize rather than enlighten many potential buyers. Others would hang up in a rage over the waste of their time. And oral recitation would not avoid customers' assertions (whether true or feigned) that the clerk did not read term X to them, or that they did not remember or understand it.

*Hill*, 105 F.3d at 1149; *see also ProCD*, 86 F.3d at 1451. The situation faced by McDonald's presents an apt comparison. To require McDonald's cashiers to recite to each and every customer the fourteen pages of the Official Rules, and then have each customer sign an agreement to be bound by the rules, would be unreasonable and unworkable. The Official Rules were identified to Ms. James as part of the contest, and that identification is sufficient in this case to apprise her of the contents of the rules.

### 2. Costs of Arbitration

Ms. James also contends that the arbitration clause should not be enforced because the high up-front costs of arbitration prohibit her from pursuing a remedy in that forum. Ms. James relies on *Green Tree*, 531 U.S. at 81, in which the Supreme Court recognized that "the existence of large arbitration costs may well preclude a litigant . . . from effectively vindicating" statutory rights in arbitration. Ms. James' reliance on *Green Tree* is misplaced. In *Green Tree*, the Court was concerned with whether the existence of a federal statutory right under the Truth In Lending Act ("TILA"), 15 U.S.C. § 1608 et seq., evinced Congress' intent to supersede the FAA when necessary to provide access to a legal forum. 531 U.S. at 80-81. It remains unclear whether the rationale of *Green Tree* applies to situations that do not involve the assertion of federal statutory rights. *See* Richard M. Alderman, *Pre-Dispute Mandatory Arbitration in Consumer Contracts: A Call for Reform*, 28 Hous. L. Rev. 1237, 1253 (2001); *see also Brown v. Wheat First Sec., Inc.*, 257 F.3d 821, 825 (D.C. Cir.), *cert. denied*, 534 U.S. 1067 (2001) (declining to extend to non-statutory claims a prior holding prohibiting an employer from requiring an employee to arbitrate all disputes relating to the employment relationship as a

condition of employment and also to require the employee to bear all or part of the costs of arbitration). The cases relied on by Ms. James similarly involve federal statutory claims. *See* Appellant's Br. at 15-18.

Without deciding whether *Green Tree* extends to common law or state law claims, we note that, in any event, Ms. James has not made a showing that the expenses that she necessarily and definitely would incur would make arbitration prohibitive. "[A] party seeking to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive bears the burden of showing the likelihood of incurring such costs." *Green Tree*, 531 U.S. at 81. Ms. James relies on the affidavit of Michael Eiben, who is a member of the Panel of Neutrals for the American Arbitration Association ("AAA"), to establish the costs of arbitration. Eiben estimated that Ms. James would have to pay $38,000 to $80,000 in fees and service costs before arbitration commenced in order to pursue her claims. *See* R.28, Ex.2 at 1. Ms. James filed a sworn affidavit stating that she does not have the financial resources to advance those fees. *See* R.28, Ex.1 at 2.

The AAA's Commercial Rules contain provisions to protect parties from prohibitive expenses. The Eighth Circuit has recognized that the

> AAA . . . has a fee waiver procedure. It decides whether or not to waive, in whole or in part, a fee on the basis of a claimant's financial situation. It is clear, however, from our reading of the evidentiary hearing transcript, that the [plaintiff] never fully explored the AAA's fee waiver procedures because [he] refused to provide his family's financial information to the AAA. This is an important step that must be taken before an unconscionability determination can be made.

*Dobbins v. Hawk's Enters.*, 198 F.3d 715, 717 (8th Cir. 1999); *see also American Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 712 (5th Cir. 2002), *cert. denied*, 537 U.S. 1106 (2003) ("[T]he rules of the AAA provide . . . sufficient avenues to request fee-paying relief, if necessary."). Ms. James has submitted no evidence indicating how her financial situation would be factored into an assessment of the arbitration costs under this hardship provision.[4] Furthermore, Ms. James has not provided any evidence concerning the comparative expense of litigating her claims. The cost differential between arbitration and litigation is evidence highly probative to Ms. James' claim that requiring her to proceed through arbitration, rather than through the courts, will effectively deny her legal recourse. *See Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 556 (4th Cir. 2001) (applying a case-by-case analysis in the employment discrimination context focused on "ability to pay the arbitration fees and costs, the

---

[4]  We are not persuaded, in contrast, by McDonald's submission that, if the arbitrator imposes burdensome costs on Ms. James, she can return to the district court and seek review of the cost allocation. *See DeGroff v. Masotech Forming Techs.-Fort Wayne, Inc.*, 179 F. Supp. 2d 896, 912 (N.D. Ind. 2001) ("[S]hould [plaintiff] appeal any arbitration award, the reviewing court could assess whether unreasonable arbitration fees were imposed."). Ms. James maintains that she cannot afford to pursue arbitration *in the first instance*. A review of the allocation of costs conducted after the arbitration would be of little help to her. Also, we find little relevance to McDonald's claim that it offered to pay Ms. James the costs of arbitration, if she would be willing to conduct the arbitration according to the AAA's Consumer Dispute-Related Rules. These rules have a truncated procedure and apply to claims that do not exceed ten thousand dollars. Ms. James believed her claim was worth at least one million dollars, the purported value of her game card, plus interest and costs. Therefore, she was under no obligation to accept McDonald's limiting offer.

expected cost differential between arbitration and litigation in court, and whether the cost differential is so substantial as to deter the bringing of claims").

### 3. Fraud in the Inducement

Finally, Ms. James claims that the arbitration clause is unenforceable as a matter of public policy because it was part of McDonald's alleged scheme to defraud. The Supreme Court has spoken to this issue:

> [I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally. . . . We hold, therefore, that in passing upon a § 3 [of the FAA] application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate.

*Prima Paint*, 388 U.S. at 403. Thus, "a court may consider a claim that a contracting party was fraudulently induced to include an arbitration provision in the agreement but not claims that the entire contract was the product of fraud." *Sweet Dreams Unlimited v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 641 n.4 (7th Cir. 1993).[5]

---

[5] Ms. James relies on a contrary statement of the law in *Marks v. Bean*, 57 S.W.3d 303 (Ky. Ct. App. 2001). However, *Marks* was overruled expressly by *Louisville Peterbilt, Inc. v. Cox*, 132 S.W.3d 850 (Ky. 2004), which applied the *Prima Paint* standard to the Kentucky Uniform Arbitration Act. In any event, Kentucky's

(continued...)

Ms. James' complaint alleged that she was induced into participating in the "Who Wants to be a Millionaire" game by McDonald's allegedly deceptive practices. Her allegations say nothing of fraud related uniquely to the arbitration clause. Therefore, under *Prima Paint*, Ms. James' fraud claim was a matter to be resolved by an arbitrator, not by the district court.

In sum, the district court appropriately granted McDonald's motion to compel arbitration.

## C. Dismissal for Failure to Prosecute

A district court has the authority under Federal Rule of Civil Procedure 41(b) to enter a sua sponte order of dismissal for lack of prosecution. This authority "has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962). We review a district court's dismissal of a complaint for failure to prosecute for an abuse of discretion. *Id.* at 633. We shall presume that the district court "acted reasonably, and reversal is warranted only if it is plain that the dismissal was a mistake or that the judge did not consider factors essential to the exercise of sound discretion." *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 725 (7th Cir. 2004) (internal quotation and citation omitted).

---

[5] (...continued)
interpretation of its state arbitration statute does not control this case. The arbitrability of contracts involving interstate commerce, such as here, is governed by federal substantive law, not state law. *See Lee v. Chica*, 983 F.2d 883, 886 (8th Cir. 1993); *Goodwin v. Elkins & Co.*, 730 F.2d 99, 108 (3d Cir. 1984).

"Once a party invokes the judicial system by filing a lawsuit, it must abide by the rules of the court; a party can not decide for itself when it feels like pressing its action and when it feels like taking a break because '[t]rial judges have a responsibility to litigants to keep their court calendars as current as humanly possible.' " *GCIU Employer Ret. Fund v. Chicago Tribune Co.*, 8 F.3d 1195, 1198-99 (7th Cir. 1993) (quoting *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 608 (7th Cir. 1986)).

Ms. James contends that dismissal was too harsh of a sanction. Specifically, she maintains that the delay was not caused by neglect or dilatory tactics on her part. Rather, she "very much wanted to pursue her cause," but could not because the district court compelled her to arbitrate her claims, which she could not afford to do. Reply Br. at 8; *see* Appellant's Br. at 19-20. The district court noted that Ms. James continued to assert the same arguments that it already had ruled were not meritorious. In denying Ms. James' motion for reconsideration and, alternatively, for dismissal, the court stated:

> This request comes far too late in the day. . . . James took no steps following the Court's February 2003 order compelling arbitration to carry out that order's directive, seek reconsideration, or request certification for an interlocutory appeal. Our ruling did not give James the option of foregoing arbitration, waiting nearly a year, asking this Court for another bite at the same apple, and then reviving for appeal purposes a ruling made more than a year ago. If James wanted to appeal the February 2003 order, she should have made that request within a reasonable time after the order was entered.

R.32 at 6. The district court concluded that the law required it to compel Ms. James to arbitrate her claims. Once it so ordered, it was incumbent upon Ms. James to abide by the

district court's ruling and not to continue submitting arguments that the district court already had determined were meritless. Likewise, her failure to pursue promptly the court's reconsideration, or this court's review on interlocutory appeal, shows that the district court did not clearly abuse its discretion in dismissing Ms. James' case with prejudice.

## Conclusion

For all of the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*