# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 02-4305 & 03-1155

DORIS DEPUTY,

*Plaintiff-Appellee,*

v.

LEHMAN BROTHERS, INC.,

*Defendant-Appellant.*

———————

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 02 C 718—**Charles N. Clevert, Jr.**, *Judge.*

———————

ARGUED APRIL 17, 2003—DECIDED SEPTEMBER 29, 2003

———————

Before BAUER, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Doris Deputy sued Lehman Brothers, Inc., SG Cowen Securities Corporation, and Cowen & Company, alleging various state law claims stemming from the securities fraud allegedly perpetrated by one of the defendants' brokers. Lehman Brothers moved to stay the action and compel arbitration based on an arbitration clause contained in its Client Agreement with Deputy. The district court denied that motion, finding that Deputy had not signed the Client Agreement and that in any event the arbitration clause was against public policy. Lehman Brothers appeals. Because we conclude that the arbitration clause does not violate public policy and because the dis-

trict court did not adequately consider the validity of the signature, we reverse and remand.

**I.**

Doris Deputy has been a client of Lehman Brothers, SG Cowen Securities Corporation and Cowen & Company since 1989. During this time, Deputy's investment advisor was Frank Gruttadauria; the now infamous Gruttadauria pleaded guilty in 2002 to federal securities fraud, bank fraud, wire fraud and identity theft, and he has been described as having perpetrated one of the "largest scam[s] of retail investors ever [committed] by an individual broker."

After learning of Gruttadauria's fraud, Deputy filed suit against Lehman Brothers, Inc., SG Cowen Securities Corporation and Cowen & Company, alleging various Wisconsin state law claims, including fraud, negligent and strict liability misrepresentation, negligent supervision, breach of fiduciary duty, and various other Wisconsin statutory causes of action. Lehman Brothers responded by filing a Motion to Stay Pending Arbitration or to Dismiss. In its motion, Lehman Brothers contended that Deputy's claims were subject to arbitration based on an arbitration clause contained in its Client Agreement with Deputy. Deputy argued in response that she had not signed the Client Agreement and thus had not agreed to arbitration.

The district court scheduled a hearing for November 21, 2002 on Lehman Brothers' Motion to Stay or Dismiss. Prior to this hearing, Lehman Brothers obtained an expert opinion from handwriting expert Diane Marsh. Marsh concluded that the Client Agreements of April 26, 2001 and July 26, 2001 contained the genuine signatures of Deputy. Conversely, in an affidavit presented to the court, Deputy maintained that she did not sign the Client Agreements. Both Marsh's expert report and Deputy's affidavit were submitted along with briefing on Lehman Brothers' Motion to Stay or Dismiss prior to the November 21, 2002 hearing, and the district court reviewed both prior to the hearing.

What actually transpired during the November 21, 2002 hearing, however, turned out to be much more significant than the briefing. We therefore excerpt at length from the hearing transcript, beginning with the district court's initial comments on convening court:

I'd like to commence the hearing by telling you what I expect to look at today and consider and to give you a preliminary view of how I have viewed the matters as submitted up to this point. . . . With regard to arbitration and whether this matter should be stayed, at this point I'm inclined to deny the request to stay and would like to hear from Lehman Brothers and Cowen[1] as to why I should not come down with that decision. I've read your submissions. I've looked at the cases and have paid special attention to the decisions that were rendered in California and Ohio with respect to similar cases. I've also taken note of Miss Marsh's report and some of the requirements for considering opinion testimony, particularly the need to identify the basis for certain opinions and the absence of certain information underlying the opinion. I'm mindful of this Court's obligation as a doorkeeper with respect to opinion evidence and the need for parties offering opinion testimony to show that a particular discipline has been adhered to and that there is an objective slash scientific basis for certain types of opinion evidence. I'm also mindful of the terms that were utilized in the opinion evidence and the factual basis for the opinion offered by Miss Marsh, that being a review of a photocopy, the

---

[1] Although the district court noted that it would like to hear from both Lehman Brothers and Cowen on the issue, only Lehman Brothers sought a stay pending arbitration, as Cowen did not claim that Deputy had agreed to arbitrate her claims. Accordingly, this interlocutory appeal concerns only Lehman Brothers' Motion to Stay or Dismiss pending arbitration.

authenticity of which was not addressed, and the absence of any certification by Lehman Brothers that its document person knew anything about the authenticity of the photocopy or the circumstances in connection with which it was created.

I'm mindful that the submission[s] do not show that the so-called arbitration agreement was prepared by anyone operating in the ordinary course of business or that it was within, the person was operating within the scope of his or her authority when they created the so-called arbitration agreements. Having said all that I'd like to hear from Lehman Brothers and SG Cowen as to why this case should be stayed.

In response to the district court's expressed concerns as to Lehman Brothers' expert report, Lehman Brothers explained that "we have Miss Marsh here and prepared to testify and I believe, and very briefly, and I believe the testimony will address a number of the issues that Your Honor has raised with respect to the forgery, whether or not it is a forgery as raised by the claimant [Deputy]." At this point, Deputy's attorney objected to evidence being taken, stating "[t]his is a motion to dismiss. Such evidence is beyond obviously the written record. The parties had an opportunity to submit affidavits and so on. Miss Marsh's affidavit was submitted. We did not have an opportunity to submit an affidavit. We did not hire an expert." Deputy's attorney then noted that by taking evidence, the hearing was seemingly turning into a motion for summary judgment.

The district court then responded:

Well, I think you're accurate in saying that it does smack of a motion for summary judgment. You're also equally accurate that it's well beyond the usual scope of a motion to dismiss. And with those acknowledgments on the record I will give to Lehman Brothers and Cowen an opportunity to present this testimony. I am not going to preclude you, however, from offering whatever

evidence you have. And if it is your desire to present expert testimony to counter that offered here today, we may certainly have the opportunity to hear that expert testimony. I know that this case is in an unusual posture and I know also that if the issue concerning arbitration is played out to its fullest in this forum we may in essence have what constitutes a trial on the issue as to whether or not the parties were, had a valid arbitration agreement. And so in a sense we're putting a little of the trial first as opposed to somewhere near the end. And I will tell you, Lehman Brothers and SG Cowen will not have two kicks at this portion of the cat. . . . So if they're presenting their testimony now they're not going to bootstrap it later.

The hearing then continued with Lehman Brothers calling Marsh to the stand. After introducing herself, Marsh testified that she was a forensic document examiner, that she had been involved in this profession for 21 years, that she belonged to the World Association of Document Examiners, the Independent Association of Questioned Document Examiners, and that she was a diplomat of the American Board of Forensic Examiners. Marsh then further elaborated on her experience, stating that she had testified in state or federal court as a forensic document examiner approximately 115 times. Lehman Brothers' attorney then asked Marsh whether "any court refused to accept you as an expert witness in this subject matter?" Marsh responded: "No."

The district court then inquired: "I'm curious Miss Marsh, did you testify in Leon S. Malachinski versus Commissioner of Internal Revenue Service?" Marsh responded, "I don't, it doesn't sound familiar," and that since she had testified over 115 times she would have to check her list and see. After the district court gave Marsh the legal citations to that case, Marsh responded, "it doesn't sound familiar, but I still can't say." The district court then told Marsh that the case

involved a Dr. Malachinski and his ex-wife who had filed
joint federal income tax returns in 1980 and 1981 and asked
whether that sounded at all familiar. Marsh once again
responded, "I'm sorry. It doesn't sound familiar but I don't,
what, it doesn't sound familiar but—" The district court
then broke in and stated, "Well, I have a copy of the deci-
sion and in this case it indicates that Dr. Malachinski
introduced an expert report of Diane Marsh." Marsh
responded, "Well, then apparently I must have been
involved in some way," to which the district court stated
that "if you are the same person it says that the court
rejected your expert report." Marsh rejoined: "I'm not fami-
liar with that." At this point the district court said, "I'll hear
what you have to say," and Marsh then continued with her
testimony concerning the disputed issue, namely whether
the signatures on the Client Agreements were Deputy's.

In this regard, Marsh testified that Lehman Brothers had
provided her with four documents containing a "Doris
Deputy" signature for her review. These documents, iden-
tified as Q1, Q2, Q3, and Q4, were, respectively, an Option
Approval Form and Agreement dated February 20, 1993; a
Client Agreement dated April 26, 2001; a Client Agreement
dated June 4, 2001; and a Client Agreement dated July 26,
2001. Marsh explained that she compared these questionable
signatures with the signature contained in Exhibit 4, which
was a copy of a letter Lehman Brothers provided her as an
authentic example of Doris Deputy's signature,[2] but that she
was unable to determine the validity of the Q1-Q4 signa-
tures based on just one exemplar. Specifically, in a Septem-
ber 20, 2002 report, Marsh stated:

---

[2] During the hearing, Deputy's attorney argued that Lehman
Brothers had failed to authenticate the signature contained in
Exhibit 4. Lehman Brothers offered to establish its authenticity,
but the question became moot when the district court rejected
Marsh's testimony in whole.

In this examination, I had only one (1) known standard to compare with the four (4) questioned signatures. After a complete examination, I have concluded that the one (1) standard signature of Doris A. Deputy is not sufficient to be able to reach an opinion as to whether Doris A. Deputy signed the four (4) documents in question. Before a conclusion can be reached, additional samples of the genuine signature of Doris A. Deputy need to be submitted for examination. Since the questioned documents span a time period of February 20, 1993, through July 26, 2001, it would be advisable to have known standards covering this time frame.

After receiving this report, Lehman Brothers provided Marsh with a second sample of Deputy's signature, namely a facsimile copy of Deputy's signature from the affidavit she had filed with the district court in this pending litigation. Marsh explained that although she was unable to reach a conclusion as to the validity of the signatures contained in Q1-Q4 based solely on the sample contained in Exhibit 4, when considered along with the additional sample, she was able to render an expert opinion as to the validity of the signatures contained in Q2 and Q4 (which were the Client Agreements dated April 26, 2001 and July 26, 2001, respectively) and that those signatures were genuine. However, Marsh stated that she was still unable to determine the validity of the signatures contained in Q1 and Q3.

During the hearing, Marsh further explained the basis of her conclusion that the signatures on the April and July Client Agreements were valid. Marsh noted that she first examined the signatures with the naked eye and then under a magnifying glass and microscope. Marsh then explained that in doing so she was looking for any indication of a pen lift, a tremor in the signature, or the possibility of the signature being a cut and paste. As to the Q2 signature, Marsh then explained:

The questioned signature compares favorably with the two known signatures, standard one and standard

two. There's agreement in beginning strokes, ending strokes, letter formations, T crossings, spacing, relative proportions, closeness of the letters. And on the original, the Lehman Brothers agreement I looked at under microscope and there's fine beginnings and fine endings. There's no pen lifts where the signature was patched together. Everything was made in a fluent smooth matter, so I arrived at the conclusion that all three of the signatures were written by the same individual, the questioned signature and the two standards.

Marsh further detailed her handwriting analysis by explaining that:

I did the complete analysis and there were, there's comparisons, favorable comparisons in the letter formations, in the beginning strokes, in the ending strokes, the T formations, how the T is crossed, how the Y is ended. And I also with the original that I had I looked at it under a microscope and it had fine beginnings and fine endings. And when signatures are forged the forger will put the pen down on the paper and then start drawing the signature and there will be tremors and they will end with blunt beginnings and blunt endings. And this original signature had fine beginnings and fine tapered endings. And my opinion is that it is not a forgery.

On cross-examination, Deputy's attorney asked Marsh about differences in the signatures and Marsh acknowledged that the signatures were not identical, but also explained that "[a] person always has, they have what we call variations," "when a person signs their name they never sign their name exactly the same way because a person is not a machine." Deputy's attorney also questioned Marsh about the fact that the Client Agreements contained Deputy's middle initial, whereas her genuine signature on the affidavit did not. Marsh stated that in her experience the same individual did not always use a middle initial and that

"[i]n document examination the middle initial, the addition or subtraction of a middle initial is not considered a fundamental difference in determining if two signatures were written by the same individual." Deputy's attorney further asked Marsh about differences in the look of the "D" in Doris, which Marsh acknowledged but discounted as minor variations.

Marsh faced additional questions concerning her use of a copy to compare the signatures and Marsh explained that it is "better to have the original whenever it's available," but then stated that "when the original is not available if we have a good photocopy then a photocopy can be used." Marsh also acknowledged that the exemplar contained in Exhibit 4 was faded in part and missing the top portion of part of Deputy's signature. But Marsh testified that that exhibit allowed her to "see the letter formations and then I had the affidavit," and that together with the affidavit she was able to form an expert opinion. Marsh also admitted that it is difficult to tell if there are fine beginnings and fine endings from copies, such as the one she looked at in Exhibit 4. However, Marsh reaffirmed that based on the two comparisons—the one original and the copy—she was able to conclude that the two signatures contained on the Client Agreements were genuine. Additionally, on cross-examination Marsh admitted that she had originally provided an expert opinion that the signatures on the Client Agreements were valid based solely on photocopies, but she explained that she had qualified her opinion as being based on copies. Specifically, in her opinion letter Marsh stated: "This opinion is qualified as my examination was made from photocopies. However, if it can be assumed that the photocopies accurately reflect the appearance of the originals, there is little likelihood that the findings would be changed or modified by such reexamination." At the hearing, Marsh then explained that the copies "were good copies" and were sufficient to form an opinion. Marsh further noted that while her opinion was originally qualified, she had since

seen the original and that her opinion that the signatures on the two Client Agreements were genuine was now unqualified.

After Marsh had explained her opinion and the process by which she had formed her opinion, the district court asked, "Miss Marsh, you described your work as a science, is that correct?" After responding in the affirmative, the district court asked why she described it as a science, to which Marsh responded:

> Well, it is considered a science but it's not an exact science like mathematics. I believe mathematics is the only exact science. But it is considered a science. Scientific instruments were used for the examination. For example, the microscope, those are all, and looking, if I check for anything on ink comparisons or any measurements, that's all considered a scientific examination. So it is considered a scientific science.

Upon further inquiry from the court Marsh explained:

> Well, I have other instruments. I have what is called an ESDA, electrostatic detection device and that determines differences in ink. The abbreviation is ESDA. Electrostatic detection apparatus. I also have an infrared video spectra scanner which differentiates between inks. The ESDA picks up indentations. It determines if there's indentations on a document. I have an ultraviolet lamp which can be used to determine differences in paper. And all that is considered a scientific examination.

The district court then stated: "Well, let me get at what is the heart of my questioning. Is there a set of principles or rules coupled with techniques and the use of instruments utilized in document examinations?" The court also inquired as to whether "there [are] any principles that govern document examination by you and others who engage in your profession?" Marsh then explained:

> [T]here are principles. When we attend the seminars, they teach how to go through to examine a document.

And so there are principles. You compare the letter formations and such. When you're comparing two signatures the way you compare is by the letter formations, by the beginning strokes, ending strokes, relative proportions, height of the taller letters, length of the extenders, the closeness of the letters, whether it's on the line, the alignment to the line, whether it's off the line, whether it's written on a slant upward or a slant downward.

So there are various principles that you go through and you check when you're comparing one signature to another. And then we're taught what variations are. Variations is, because a person never signs their name exactly the same way twice. They can have variations in their signatures. So we learn what variations are. And we learn what fundamental differences are. And variations is, well, for example, a person who has a Y in their name, they may make the length of the down stroke on the Y, it may vary in length from time to time. It won't be exactly the same length from time to time. It won't be exactly the same length all the time.

A fundamental difference is a stroke that is entirely different. Like a letter may be started in a totally different way than what the exemplars are. And if that's in the evidence then that can be a fundamental difference. But of course, you need, you know, the signatures for the comparison to point out the fundamental differences.

The district court then asked: "Is there a particular set of variations, fundamental differences or other characteristics that must be seen or eliminated in order to arrive at an opinion?" Marsh explained that "[t]here is not a particular set that's set up. . . . I have never seen a made up list. Other than what I have already gone through where when you're making comparisons you make up, you make comparisons, like as I said, in the beginning stroke, ending strokes, alignment, letter formations. . ." but that there are no particular

number of points of comparisons. Rather, as an expert, Marsh explained, she must determine if there is a fundamental difference because "in order to determine that two signatures were not written by the same individual you only need one fundamental difference." Marsh then elaborated, noting that she relies on printed works common in the profession which detail fundamental differences, and that she used several books common in the profession to reach her expert conclusions.

Following this testimony, the district court asked the parties how much additional time they would need for argument. Lehman Brothers began by noting that it would first be necessary to present a witness "with respect to the business record aspect of these documents," likely meaning that Lehman Brothers would present a witness able to authenticate Exhibit 4. The district court apparently believed such testimony unnecessary and instead ruled:

> I will tell you right now I am rejecting this testimony. So we proceed based upon that determination. I'll set forth in some greater detail my reasoning in rejecting the testimony as the gatekeeper in the matter, and clearly one of the reasons is that Lehman Brothers has not demonstrated that this testimony is based upon any fundamental set of principles. Just because someone has an opinion it doesn't mean that that opinion is valid. Just because someone has experience, it doesn't mean that experience warrants receipt of the opinion.

> And as noted at the inception of this witness's testimony, she has failed to accurately recount her credentials, and in particular, the fact that her testimony has been previously rejected in court. If you would like for me to catalog, list, itemize, set forth in particularity the other reasons why I'm rejecting this testimony I can certainly do that at a later time. But in fairness to my reporter and in consideration of the hour which is now 5:19 p.m. we will adjourn for today. I can take up this matter at 10:30 tomorrow morning and will do so.

At the hearing the next morning, Lehman Brothers, in summarizing its position, began by noting that the district court had ruled that expert testimony was inappropriate on the issue of the validity of the signature. The district court broke in to clarify, stating:

I didn't rule that expert testimony was inappropriate. So that should be clear. I ruled that the expert testimony that you offered should be rejected and that the testimony of your witness in particular was not admissible as expert testimony. Number two, that she was not credible. In fact, I rejected her for a variety of reasons which I did not describe completely and I indicated to you yesterday that if you wanted further explanation or further reasons why I was rejecting her testimony I would provide that to you today. You may proceed.

Lehman Brothers then continued, noting that it had not meant to mischaracterize the district court's ruling, but that it merely meant that the district court's "ruling yesterday with respect to the expert testimony that was offered by Lehman Brothers" does not end the inquiry. Rather, Lehman Brothers explained, it believed a fact issue as to whether Deputy had in fact signed the arbitration agreement still needed to be decided, which would require the court to consider on its own the various samples provided to determine their validity. Additionally, Lehman Brothers stated that it needed limited discovery so as to depose those familiar with Deputy's signature in order to present testimony supporting the validity of the signature contained on the Client Agreements. Lehman Brothers further noted the need for a full hearing to determine the ultimate question as to whether Deputy signed the arbitration agreements.

Deputy's attorney objected to any further discovery or hearing, and the district court "agree[d] 100 percent," stating:

Yesterday when we commenced the hearing [Deputy's attorney] expressed his concern that Lehman Brothers had consulted with an expert and had brought that ex-

pert here to testify. He underscored his lack of prepara-
tion for the hearing and lack of notice that the defense
expert would appear. During the course of the hearing
it became apparent that the defense expert—and I use
that term loosely in this case because I did not find her
to be an expert qualified to testify here—had been given
a number of documents starting in August of this year
and had rendered two opinions, only one of which had
been proffered and made known to the plaintiff and the
Court prior to yesterday.

As [Deputy' attorney] noted during the course of his
remarks, I stated yesterday that there would be but one
kick at the cat. The request of Lehman to conduct dis-
covery on an issue that it has already explored is little
more than a thinly disguised attempt to revisit the issue
that we considered yesterday. We will not go down that
path again. The request for delay is denied. Moreover,
the request for further discovery on this issue prior to
the Court ruling is denied.

Later during the hearing, the district court once again
commented on its ruling barring Marsh's testimony, stating:

I do want to just note that in reference to Rule 702 an
expert may testify if the testimony is based upon suf-
ficient facts or data and the testimony is the product
of reliable principles and methods and the witness
has applied the principles and methods reliably to
the facts of the case. I did emphasize yesterday during
my inquiry of Miss Marsh that there was a need for her
to tell me what scientific principles or methods or reli-
able principles and methods she had applied. None was
forthcoming. She mentioned that handwriting analysis
or documentary examination was a science. And all that
she could tell me about her science, about the scientific
aspect of her work was that she used a magnifying
glass, microscope and presumably a ruler  in reaching
the conclusion after looking at facsimile  copies of
documents that she was told were authentic.

After again rejecting Marsh's testimony, and based on Deputy's affidavit in which she denied signing the arbitration agreements, the district court concluded that "this Court is not persuaded from what has been submitted that a valid arbitration agreement is in force and should require and requires that this case be stayed to allow arbitration to proceed." The court continued:

> Also, and this is not the central, this is not central to my decision. As a matter of public policy to stay this case would be inappropriate. The activities engaged in or allegedly engaged in here were tortious and it's difficult to see how if at all they would have been contemplated by the arbitration agreement Lehman Brothers claims Miss Deputy executed. Mr. Gruttadauria allegedly stole from Miss Deputy over an extended period of time and continued unabated for approximately twelve years. For all of that to be folded into an arbitration agreement executed in 2001 as to preclude Miss Deputy from proceeding in a court of law is wrong. So taking all of that together, the motion to stay will be denied and the Court will not direct that this case proceed to arbitration as requested by the defense.

Lehman Brothers then responded, stating that the "ruling points out why there's a need for a full evidentiary hearing." For instance, Lehman Brothers noted that the district court had based its ruling in part on Deputy's affidavit, yet it had not had an opportunity to cross-examine her. The district court responded that since Lehman Brothers had not indicated a desire for this testimony, it would "deny your request to supplement the record because that's essentially what you're asking at this stage now that I've ruled." Lehman Brothers then further explained that had the district court allowed a full evidentiary hearing, it would have presented evidence that Gruttadauria had told Deputy's attorneys that he had not forged her signature and that he believed Deputy's signature genuine. After hearing from Lehman Brothers, the district court reaffirmed its ruling

denying Lehman Brothers' requests for further discovery, an evidentiary hearing and to stay pending arbitration.

About a month later, the district court issued a written decision and order denying Lehman Brothers' Motion to Stay Pending Arbitration or to Dismiss. In this written order, the district court reiterated its oral ruling, noting that it had "concluded that, at least in this case, Marsh's testimony is inadmissible under the standards of *Daubert* and did not credibly refute the affidavit testimony of Deputy." The district court explained the basis for this conclusion, noting that "[a]t the outset, Marsh could not identify a set of scientific principles or standards that she applied in this case. Nor could she explain satisfactorily the inconsistencies in her reasoning process, which led to her conclusion that Deputy's signatures were genuine." The district court also noted that Marsh's report stated "that she was able to conclude that the July 26, 2001 (Q-4) signature was genuine but adds that she could not reach a conclusion as to the July 26, 2001 (Q-4) signature." Marsh, however, had explained during the hearing that the report contained a typographical error and that the report should have stated that "she could not reach a conclusion as to the June 4, 2001 (Q-3) signature.

The district court further expanded on its rationale, stating:

> More importantly, once in court, Marsh admitted that she did not ask to see the original documents in forming her opinion and that she received and used facsimile copies. In her own words, photocopies and facsimiles are "less than optimal examples." She further admitted that on September 20, 2002, she could not render an opinion on the four documents referred to in her report, but changed her mind on September 24, 2002, after seeing the Deputy affidavit (or one additional signature). On cross-examination, Marsh acknowledged the absence of Deputy's middle initial in one of the documents as well as variations in the name "Deputy."

Finally, the court found Marsh less than candid regarding her testimony in *Malachinski v. C.I.R.*, 268 F.3d 497 (7th Cir. 2001), a case which is listed on her record of court testimony. In that case, the court found Marsh's report did not adequately set forth the facts and reasons supporting Marsh's conclusions.

After rejecting Marsh's testimony, the district court concluded that based on Deputy's affidavit, in which she attested that she had not signed the Client Agreements, "the court was satisfied that the parties did not agree to arbitrate their dispute." The district court added that "[a]lthough this record at this stage does not demonstrate that Deputy signed the Client Agreements dated April 26 and July 26, 2001, assuming she did raises significant public policy concerns. Deputy would have been asked to sign the Agreements in 2001 or twelve years after the onset of the fraud." For these reasons, the court denied Lehman Brothers' Motion to Stay or Dismiss pending arbitration. Lehman Brothers appeals from this ruling.

## I.

On appeal, Lehman Brothers contends that the district court erred in several ways. First, Lehman Brothers claims that the district court erred in excluding Marsh's expert testimony by failing to properly apply *Daubert* and by misreading the *Malachinski* case in which Marsh previously testified as an expert. Next, Lehman Brothers argues that the district court erred by refusing to compare the various samples of Deputy's handwriting with the disputed signatures contained on the Client Agreements. Lehman Brothers asserts that had the district court made this comparison, the similarities between the signatures would have necessitated a full evidentiary hearing to determine if Deputy had signed the two client agreements at issue. And Lehman Brothers maintains that the district court's failure to hold such an evidentiary hearing also constitutes reversible error. Additionally, Lehman Brothers maintains that the district court

wrongly refused its request for additional discovery in preparation for a full evidentiary hearing. We consider each issue in turn.

## A.  Marsh's Proffered Expert Testimony

Lehman Brothers first challenges the district court's rejection of Marsh's proffered expert testimony. Federal Rule of Civil Procedure 702 allows for expert testimony, providing:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Civ. P. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that the district court must perform a gatekeeping function to determine whether expert scientific evidence is admissible under Rule 702. *Id.* at 593-95. *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending *Daubert* to other non-scientific types of expert testimony). To determine admissibility under Rule 702, the *Daubert* Court announced five factors that may be used in assessing the relevancy and reliability of expert testimony: (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *Daubert*, 509 U.S. at 593-94. However, as the Court clarified in *Kumho*, this list is neither definitive nor

exhaustive, but rather flexible to account for the various types of potentially appropriate expert testimony. *Kumho*, 526 U.S. at 141. In reviewing the district court's decision concerning the admissibility of an expert's testimony, we review de novo whether the district court properly followed the *Daubert* framework. *Walker v. Soo Line R. Co.*, 208 F.3d 581, 590 (7th Cir. 2000). And if the district court properly applied *Daubert*, we review the "court's decision to admit or exclude expert testimony only for an abuse of discretion." *Id.*

In this case, in rejecting Marsh's testimony during the November 21, 2002 hearing, the district court provided only two reasons: (1) that "Lehman Brothers has not demonstrated that this testimony is based upon any fundamental set of principles;" and (2) that Marsh "has failed to accurately recount her credentials, and in particular, the fact that her testimony has been previously rejected in court." However, the district court also stated that it would "set forth in particularity the other reasons why [the court was] rejecting this testimony." The district court did that in its later-issued written order, listing seven reasons: (1) Marsh could not identify a set of scientific principles or standards that she applied in this case; (2) she did not adequately explain the inconsistencies in her reasoning process, which led to her conclusion that Deputy's signatures were genuine; (3) Marsh's report stated that she was able to conclude that the July 26, 2001 signature was genuine, while at the same time stating "she could not reach a conclusion as to the July 26, 2001 signature"; (4) "Marsh admitted that she did not ask to see the original documents in forming her opinion and that she received and used facsimile copies"; (5) she admitted on September 20, 2002 that she could not render an opinion on the four documents, but changed her mind on September 24, 2002, after seeing Deputy's affidavit; (6) Marsh acknowledged the absence of Deputy's middle initial in one of the document as well as variations in the name "Deputy"; (7) "Marsh [was] less than candid regarding her testimony in *Malachinski v. C.I.R.*, 268 F.3d 497 (7th

Cir. 2001), a case which is listed on her record of court testimony. . . . [in which] the court found Marsh's report did not adequately set forth the facts and reasons supporting Marsh's conclusions."

Most of these seven stated reasons concerned issues of credibility and persuasiveness, but such considerations are relevant only in valuing the testimony, not in determining its admissibility. As we explained in *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000), "[i]t is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *See also, id.* (whether an expert's theory is correct is a factual question for the jury to determine). For instance, as its third reason for rejecting Marsh's testimony the district court noted that Marsh's expert report contradictorily stated that the July 26, 2001 signature was genuine, but in the same report stated that her analysis was inconclusive as to the July 26, 2001 signature. At the hearing, however, Marsh explained that the inconsistency was merely a typographical error, and that the report should have stated that the review of the June 4, 2001 statement was inconclusive. A typographical error appearing in an expert report might lead a fact-finder to conclude that the expert is sloppy, but it does not render an expert's opinion unreliable and thus inadmissible.

The next rationale offered by the district court concerned Marsh's reliance on facsimile copies. Contrary to the district court's statement that Marsh had not asked to see the originals, Marsh had testified that she always requests the originals. Additionally, Marsh testified that she had qualified her original report on the basis that she did not have access to the originals, but that she had since had an opportunity to view the original and her conclusion remained unchanged. Thus, contrary to the district court's statement, Marsh's expert opinion was not based solely on facsimiles. However, even if it were, the district court did not adequately explore whether experts in the field believe it pos-

sible to form an opinion solely from a facsimile, or in this case on the basis of one facsimile and one original copy. Although Marsh testified that facsimiles are less than ideal, and that an original is preferable, she also testified that a handwriting expert could reach a conclusion on the basis of the two samples provided. Whether or not experts in the field would agree, however, is unclear from the record, and that should have been the district court's focus.

Similarly, the district court rejected Marsh's testimony because on September 20, 2002, she stated that she could not render an opinion on the four documents, but then changed her mind on September 24, 2002, after seeing Deputy's affidavit. Again, the district court went beyond determining admissibility and focused on credibility. This was error because "the focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate." *Cummins v. Lyle Indust.*, 93 F.3d 362, 368 (7th Cir. 1996). Thus, the district court's inquiry should have been on whether professionals in the field of handwriting analysis agree that the addition of a second sample allows for a conclusion as to the validity of the signature at issue. The only testimony before the district court was Marsh's, and she stated that two samples were sufficient in her field to render an opinion. Rather than explore this issue further, the district court in effect found Marsh not credible because she had changed her opinion after obtaining only one additional sample.[3]

The court's next rationale regarding Marsh's acknowledgment of Deputy's missing middle initial in one of the documents, as well as variations in the name "Deputy" has no bearing on the *Daubert* analysis because it merely calls

---

[3] Similarly, on appeal, Deputy argues that Marsh's testimony was not credible because she did not disclose her initial September 20 inconclusive opinion, implying that Marsh was in some way trying to hide that fact. Although it might be appropriate for a fact-finder to consider this fact in assessing credibility, it is inappropriate to rely on this non-disclosure as a basis for rejecting Marsh's expert opinion.

into question the persuasiveness of her opinion, not whether she applied the appropriate expert standards in reviewing the signatures. *See United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002) ("Once a trial judge determines the reliability of the proffered expert's methodology and the validity of his reasoning, the expert should be permitted to testify as to the inferences and conclusions he draws from it, and any flaws in his opinion may be exposed through cross-examination or competing expert testimony. . . ."). Moreover, in this case Marsh provided an explanation as to these differences, stating that the exclusion of a middle initial is typical and does not indicate that a signature is not genuine. Similarly, Marsh explained that variations exist in everyone's signatures, and that those appearing in the various "Deputy" signatures were minor variations. A finder of fact might not accept those explanations, but that is a different issue from whether the testimony is admissible in the first instance. *See Smith*, 215 F.3d at 719.

Another reason the district court offered was that "Marsh [was] less than candid regarding her testimony in *Malachinski v. C.I.R.*, 268 F.3d 497 (7th Cir. 2001), a case which is listed on her record of court testimony. . . . [in which] the court found Marsh's report did not adequately set forth the facts and reasons supporting Marsh's conclusions." In this regard, the district court doubly erred. First, the district court misread the *Malachinski* case. In that case, Marsh presented an expert report as to the genuineness of a signature appearing on a tax return, and then at trial was called as a witness. *Malachinski v. C.I.R.*, 1999 WL 349342 (Tax Ct. 1999). The Tax Court in that case held that Marsh's live testimony should be limited to the information provided in her expert report based on Tax Court Rule 143(f). (Rule 143(f) prohibits expert testimony beyond that provided prior to trial in an expert report.) On appeal, this court affirmed. *Malachinski*, 268 F.3d 497. In doing so, although we noted that Marsh's report was conclusory and did not set forth the facts supporting her opinion, this court did not reject her expert testimony; rather we affirmed the Tax

Court's application of its rule limiting her testimony to the content of her report. *Id.* at 501-02. Simply put, Marsh's testimony was not rejected as unreliable under *Daubert* in *Malachinski*. *Id.* Thus, factually the district court clearly erred. Legally, the district court also erred, because its view that Marsh "was less than candid regarding her testimony," even if true,[4] at best went to Marsh's credibility and not the admissibility of her expert opinion.

The other two reasons given by the district court were that Marsh did not adequately explain the inconsistencies in her reasoning process and that "Lehman Brothers has not demonstrated that this testimony is based upon any fundamental set of principles." It is unclear what the district court meant by inconsistencies in Marsh's reasoning process, and in any event, inconsistencies tend to concern credibility. If by "inconsistencies in her reasoning process" the district court meant that Marsh failed to follow the proper standards required of handwriting experts, that was an appropriate inquiry under *Daubert*. Marsh did, however, present evidence as to the methodology used by handwriting experts and which she used in this case, and no evidence was presented to dispute her testimony. But in any event, the more fundamental problem in this case is that too much of the district court's analysis involved factors not appropriate under *Daubert*. The transcript demonstrates that the overriding factor driving the district court's decision was its incorrect reading of *Malachinski*, and its negative view of Marsh based on its belief that the court in *Malachinski* had rejected her as an expert and that Marsh had misrepresented

---

[4] Moreover, even had the court in *Malachinski* rejected Marsh's testimony, after reading the transcript in its entirety, we would be hard pressed to affirm the district court's finding that Marsh had been less than candid about her role in that case. Marsh clearly stated several times that she did not recall that case and was not familiar with the court's holding. She had testified in over 100 cases and was candid about not recalling that case.

that fact to the district court. By incorrectly focusing on *Malachinski* and other issues relating to credibility,[5] the district court did not properly assess whether handwriting analysis in general, or Marsh's expert opinion in particular, is admissible under Rule 702. Therefore, we must reverse. *Cf. Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002) ("the record in this case reveals that the district court conducted virtually no *Daubert* analysis of [the expert's] qualifications in light of these factors," and therefore it erred in admitting the expert's testimony).

That does not mean, however, that Marsh's testimony must be admitted. Rather, on remand, the district court must properly function as a gatekeeper pursuant to *Daubert* and determine whether testimony concerning the genuineness of a signature is properly the subject of expert opinion. This circuit has yet to rule on that issue post-*Daubert*. Several other circuits and district courts have considered the issue. Every circuit that has considered the issue has allowed expert testimony on handwriting analysis. *United States v. Crisp*, 324 F.3d 261, 270 (4th Cir. 2003); *United States v. Jolivet*, 224 F.3d 902, 906 (8th Cir. 2000); *United States v. Paul*, 175 F.3d 906, 911 (11th Cir. 1999); *United States v. Jones*, 107 F.3d 1147, 1161 (6th Cir. 1997); *United States v. Velasquez*, 64 F.3d 844, 848-49 (3d Cir. 1995). Several district courts, however, have rejected handwriting analysis, finding it lacks scientific reliability. *United States v. Hines*, 55

---

[5]  On appeal, in arguing that the district court properly excluded Marsh's testimony, Deputy points to the fact that Marsh did not charge Lehman Brothers an additional fee for providing a second opinion. Deputy insinuates that this shows that Marsh did not perform any additional tests, or that her additional analysis was superficial and thus not worthy of belief. However, like the district court, Deputy is confusing issues of credibility with issues of admissibility. The fact that Marsh did not charge Lehman Brothers an additional fee is irrelevant to the question of whether Deputy's opinion is admissible under Rule 702 and *Daubert*.

F.Supp.2d 62, 68 (D. Mass. 1999); *United States v. Saelee*, 162 F.Supp.2d 1097, 1102-03 (D. Alaska 2001); *United States v. Lewis*, 220 F.Supp.2d 548, 555 (S.D.W.Va. 2002); *United States v. Brewer*, 2002 WL 596365 (N.D. Ill. 2002).

Thus, there appears to be some divergence of opinion as to the soundness of handwriting analysis. However, given that the hearing in this case improperly focused on issues related to credibility, and not the principles and methodology of handwriting analysis, we leave the question of the propriety of such testimony for further review on remand. And after remand, assuming the court properly applies the *Daubert* standards, any review in this court will be for an abuse of discretion. *Walker*, 208 F.3d at 581.

## B. Evidentiary Hearing

Lehman Brothers also contends that the district court erred in refusing to hold a full evidentiary hearing to allow it, among other things: to present testimony from lay witnesses as to the validity of the "Deputy" signature;[6] to question Deputy about her affidavit and statement that she did not sign the Client Agreements; and to present evidence concerning whether or not Gruttadauria claimed to have forged Deputy's signatures. In support of its position, Lehman Brothers cites to Section 4 of the Federal Arbitration Act, which provides that:

> The court shall hear the parties, and upon being satis-
> fied that the making of the agreement for arbitration or
> the failure to comply therewith is not in issue, the court

---

[6] The Federal Rules of Evidence permit lay testimony concerning disputed handwriting samples. *See United States v. Tipton*, 964 F.2d 650 (7th Cir. 1992). In *Tipton*, this court also upheld the use of expert testimony to establish the validity of a handwriting sample, *id.* at 654, but that case predates *Daubert*, and therefore is not controlling.

> shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.[7]

9 U.S.C. § 4.

Section 4 thus required the court to hold a trial if the making of the arbitration agreement was in issue. That was the case here: The evidence before the district court in this case was sufficient under Section 4 to mandate a trial on the issue of the genuineness of the "Deputy" signature and to allow Lehman Brothers to present additional evidence, as identified above. Specifically, the district court had before it Deputy's affidavit stating that she had not signed the Client Agreements, while sample signatures of Deputy's greatly resembled the disputed Client Agreement signatures. This created a factual issue as to the validity of Deputy's signatures. Although Deputy maintains that the

---

[7] Section 4 continues: "If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury finds that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury finds that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof." 9 U.S.C. § 4.

district court was not required to grab a magnifying glass and compare the proffered samples to the contested signatures, that response is misplaced. The various handwriting samples constituted relevant evidence as to the question of whether Deputy had in fact signed the Client Agreements. A review of these signatures demonstrates a substantial similarity between the samples and the signatures contained in the Client Agreements, and these similarities created an issue of fact as to whether Deputy in fact had signed the Client Agreements. Because this evidence was relevant, the district court erred in refusing to compare the exemplars of Deputy's signatures with those contained in the Client Agreements. That does not mean that following a trial the district court, as the fact finder, or a jury if one is requested,[8] will necessarily conclude that the "Deputy" signatures are genuine. But the district court should have considered the similarities to determine whether a trial on the issue was necessary under Section 4.

We conclude that the similarities do create a genuine issue of material fact as to the validity of the "Deputy" signatures. Moreover, this factual dispute exists even without considering the proffered expert testimony which, as explained above, is arguably admissible. Under these circumstances, the district court was required to hold a trial to determine the validity of the disputed signatures.

In response, Deputy seems to argue that Lehman Brothers waived its right to a trial under Section 4 because, before it presented Marsh's testimony, the district court warned it that it would have but "one kick at the cat." Although a vivid caution, it is unclear from this statement exactly what the district court meant, and in light of the procedural posture of the case, coupled with the other errors discussed above, we conclude that Lehman Brothers did not waive its

---

[8]   Section 4 of the Arbitration Act authorizes a jury trial, so it may be that on remand the district court will not determine the validity of the signature.

right to present further evidence concerning the validity of Deputy's signature at a trial. First, it is important to recognize that the one-kick hearing under way addressed Lehman Brothers' Motion to Stay Pending Arbitration or Dismiss. That motion was based on the arbitration clause contained in the Client Agreements. Such is the normal procedure for seeking to enforce an arbitration agreement. Deputy then responded to Lehman Brothers' motion by denying the validity of her signature.

It was Deputy's denial that altered the normal course of the proceedings, and what turned the scheduled November 21, 2002, hearing into something other than a hearing on a motion to dismiss. And although Deputy claims she was broadsided by Lehman Brothers showing up for the hearing with Marsh as a witness, the hearing transcript demonstrates that Lehman Brothers only called Marsh as a witness in response to the district court's opening salvo that it was inclined to deny the Motion to Compel because it had problems with her report. At that point, Deputy complained that she had not expected Marsh to testify and that she did not have an expert of her own available. It was in this context that the district court made the "one kick at the cat" comment. But that passing comment did not reasonably put Lehman Brothers on notice that by presenting Marsh's testimony that day it would be barred from seeking a trial under Section 4. Rather, it seems more appropriate to view the November 21, 2002, hearing as an initial inquiry into whether or not there was a genuine issue of fact concerning the validity of the "Deputy" signature. The evidence presented at that hearing demonstrated that there was in fact a genuine issue of material fact as to the authenticity of the signature. At that point, the district court should have scheduled a trial on the issue, pursuant to 9 U.S.C. § 4.

But instead the district court ruled on the limited evidence before it and made a factual finding that Deputy had not signed the Client Agreements. Because Section 4 requires a trial in cases where there is an issue as to the validity of the arbitration agreement and because the district court refused

to allow Lehman Brothers the opportunity to present other relevant evidence concerning this issue, the district court's decision must be reversed and Lehman Brothers must be given a Section 4 trial.

Additionally, Lehman Brothers must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of Deputy's signature. The district court refused Lehman Brothers' request for this discovery based on its "one kick at the cat" ruling. But, as just noted, that statement cannot be considered fair warning to Lehman Brothers that if it presented Marsh at the November 21, 2002 hearing, it would be barred from a Section 4 trial or from conducting discovery relevant to a trial on the issue of the signature. Because discovery is clearly warranted and the district court's only stated rationale fails, it was an abuse of discretion to deny Lehman Brothers' request for limited discovery.

## C.  Validity of the Arbitration Clause

In rejecting Lehman Brothers' Motion to Stay Pending Arbitration or to Dismiss, the district court noted in passing that even if it had concluded that Deputy had signed the Client Agreements containing the arbitration clauses, it would be against public policy to enforce the arbitration clause. The district court also reasoned that an enforceable contract containing an arbitration clause never existed between Lehman Brothers and its client because Gruttadauria never intended to perform his contractual obligations, and thus "there was never any meeting of the minds . . . . " 2002 WL 32121834 *3 (N.D. Ohio 2002). On appeal, Deputy argues that even if the district court erred in other respects, these alternative rationales require affirmance of the district court's denial of Lehman Brothers' Motion to Stay Pending Arbitration or to Dismiss. Because we can affirm on any basis in the record, we consider each of these arguments in turn. *Rothner v. City of Chicago*, 929 F.2d 297, 303 n.9 (7th Cir. 1991).

Deputy first maintains that the Client Agreements, in which the arbitration clauses are found, are not enforceable contracts because Gruttadauria never intended to perform his contractual obligations and thus there was no "meeting of the minds." Deputy relied on *Fazio v. Lehman Brothers, Inc.*, 268 F.Supp.2d 865 (N.D. Ohio 2002), to stand for this proposition. However, *Fazio* was recently reversed by the Sixth Circuit. *Fazio v. Lehman Brothers*, 340 F.3d 386 (6th Cir. 2003). Among other things, in reversing, the Sixth Circuit rejected the idea that no agreement existed because Gruttadauria had "no intention of acting as a true broker . . . ." *Id.* at 394. Moreover, the district court's decision in *Fazio* represents a misunderstanding of the "meeting of the minds" requirement, looking to the subjective intent of the parties instead of applying the appropriate objective standard.[9] It is black letter contract law, and also the law of the state of Wisconsin—the law governing the dispute in this case—that mutual assent "does not mean that parties must subjectively agree to the same interpretation at the time of contracting . . . . " *Management Computer Serv., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 75 (Wis. 1996). Rather, "mutual assent is judged by an objective standard, looking to the express words the parties used in the contract." *Id.* at 76. Thus, it is irrelevant in this case that Gruttadauria never subjectively intended to perform the contractual obligations. The only question is whether, objectively, there was a meeting of the minds. Under Wisconsin law, "[r]egardless of the parties' actual intentions, their execution of an unambiguous written contract establishes an enforceable 'meeting of the minds' as a matter of law." *Nauga, Inc. v. Westel Milwaukee Co., Inc.*, 576 N.W.2d 573, 577 (Wis. App. 1998). Thus, assuming Deputy signed the Client Agreements, Gruttadauria's execution established an

---

[9] Similarly, the district court in *FSP, Inc. v. Societe Generale*, 2003 WL 124515, *3 n.1 (S.D.N.Y. 2003), misapplied a subjective standard to the meeting of the minds requirement.

enforceable meetings of the minds. *See also Sarantakis v. Gruttadauria*, 2003 WL 1338087 *4 (N.D. Ill. 2003) (rejecting argument that Gruttadauria's intent to commit fraud prevented a meeting of the minds).

In response, Deputy contends that because "when the agreements were allegedly 'signed' in 2001, she had no 'understanding' that she had been defrauded for the past twelve years, and was still being defrauded, . . . there could have been no 'meeting of the minds' nor any effective manifestation of intent, and thus no contract." But Deputy's subjective intent, like Gruttadauria's, is irrelevant to the question of whether a meeting of the minds occurred,[10] and therefore Deputy's argument is misplaced.

Deputy next contends that the arbitration clause does not cover her underlying claims because she did not contemplate Gruttadauria's tortious conduct. In support of her position, Deputy once again relied on the district court's decision in *Fazio*, wherein the court held that "tort claims are not subject even to a broad arbitration clause if the conduct at issue was beyond any reasonable foreseeability or contemplation at the time the contract was executed." *Id.* at *6. The Sixth Circuit reversed this portion of *Fazio* as well, holding that the claims at issue fell within the broad scope of the arbitration clause. 340 F.3d at 396. Whether a claim is subject to arbitration depends on the contractual language, and in this case the arbitration clause did not limit its scope to reasonably foreseeable claims. Rather, the arbitration clause broadly covered:

> Any controversy: (1) arising out of or relating to any of my accounts with you, maintained individually or jointly with any other party, in any capacity; or (2)

---

[10] Of course, if Deputy had been fraudulently induced to enter the contract, that is another matter, but "Deputy does not argue that the Client Agreement is unenforceable as a fraudulently induced contract . . . ."

> with respect to transactions of any kind executed by, through or with you, your officers, directors, agents and/or employees; or (3) relating to any transactions or accounts with any of your predecessor firms by merger, acquisition or other business combination from that inception of such accounts; or (4) with respect to this agreement or any other agreements entered into with you relating to my accounts, or the breach there-of, . . . .

Deputy's claims clearly fell within the scope of this arbitration clause because they all related to her "accounts, transactions or agreements." *See Fazio*, 340 F.3d at 396. Although Deputy argues that her claims were not foresee-able, the arbitration clause contains no such "foreseeability" requirement. And thus assuming that Deputy signed the agreement, her claims are subject to arbitration. *J&K Cement Constr., Inc. v. Montalbano Builders, Inc.*, 456 N.E.2d 889, 902 (Ill. App. 1983) (when parties agree to a broad arbitration clause, it "encompass[es] disputes which are not foreseeable at the time of contracting. . . . "); *Hilti, Inc. v. Oldach*, 392 F.2d 368, 373 (1st Cir. 1968) ("The broad language of the arbitration clause forces us to conclude that the parties intended to arbitrate all disputes arising thereunder irre-spective of whether they were foreseeable at the time of agreement."); *Sarantakis*, 2003 WL 1338087 *4 (N.D. Ill. 2002) (holding broad arbitration clause covered claims based on Gruttadauria's alleged fraud).

Finally, Deputy argues that the arbitration clause is unen-forceable because it is against public policy. Specifically, Deputy claims that the clause should not be enforced because the Wisconsin "legislature has expressed a clear policy of protecting investors against untrue statements made by, and fraudulent acts committed by securities brokers and their employers." Deputy further asserts that because Gruttadauria's false statements were entirely de-liberate and because he pleaded guilty to fraud, theft and other nefarious conduct, it would violate public policy to enforce the arbitration clause. These arguments, however,

are misplaced because there is no conflict between Wisconsin's policy of protecting investors and the enforcement of an arbitration clause—the latter merely determines the forum in which investors' rights are protected. *Kroog v. Mait*, 712 F.2d 1148, 1153-54 (7th Cir. 1983) (rejecting district court's conclusion that enforcing an arbitration clause violated Wisconsin's security regulations). And the alleged criminal nature of Gruttadauria's conduct, while potentially relevant for the issue of arbitrability depending on the language of the arbitration clause (although the language in this case, as explained above, does not consider the criminality of the alleged conduct), is entirely irrelevant from a public policy perspective: the arbitration clause does not prevent Deputy from obtaining a remedy for Gruttadauria's criminal conduct—it merely specifies the forum in which that relief takes place. *Cf. Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 240 (1987) (RICO's criminal provisions do not preclude arbitration of civil actions). In fact, both of these arguments illustrate that Deputy's position assumes a false premise—that enforcing an arbitration clause will deny Deputy recompense for the alleged wrongs she suffered. That is clearly not the case; rather, it merely means that Deputy's claims will be resolved in a different forum. And to the extent that Deputy believes that enforcing arbitration provisions violates the public policy of giving plaintiffs their day in court, that argument is misplaced as Congress in passing the Federal Arbitration Act has made clear that public policy favors arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). As the Supreme Court explained in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), the FAA seeks "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Id.* at 24. Thus, the Supreme Court has instructed lower courts to "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). These are the principles that

must be applied here, assuming Deputy in fact signed the Client Agreements containing the arbitration clause.[11]

### III.

In passing the Federal Arbitration Act, Congress codified a federal policy in favor of arbitration. Although arbitration cannot be forced on the parties, if they agreed to arbitration, the arbitration agreement must be enforced and doing so actually furthers, as opposed to contradicts, public policy. In this case, however, that is a big "if," as Deputy maintains that she never signed the Client Agreements. The district court agreed, but in the process made several errors. First, the district court erred in applying *Daubert* to determine the admissibility of Lehman's proffered expert. That is not to say that expert opinions on handwriting analysis are categorically admissible; rather, on remand the district court must assess the propriety of such testimony in light of *Daubert* and this opinion. The district court also erred in refusing to allow limited discovery for the purposes of determining the genuineness of the "Deputy" signatures and in prohibiting Lehman Brothers from presenting other evidence, such as lay testimony, supporting its claim that Deputy in fact signed the Client Agreements. For these and the foregoing reasons, we REVERSE and REMAND. On

---

[11] Deputy cites the unpublished order entered in *Meyeroff v. S.G. Cowen Sec., Inc.*, 02-CV-1084W (S.D. Cal. 2002), and *Fazio v. Lehman Bros., Inc.*, 268 F.Supp.2d 865, for the proposition that arbitration clauses contained in Client Service Agreements like the one at issue in this case are unenforceable as against public policy. *Fazio*, however, was reversed on appeal. 340 F.3d 386. And *Meyeroff* is not controlling, and in any event we find it unpersuasive. *Compare with Sarantakis v. Gruttadauria*, 2003 WL 1338087 (N.D. Ill. 2003) (enforcing arbitration clause contained in Lehman Brothers' Client Agreement in suit brought concerning Gruttadauria's alleged fraud).

remand, Circuit Rule 36 shall apply and the district court shall proceed in a manner consistent with this opinion.


A true Copy:

  Teste:


        _____
        *Clerk of the United States Court of*
         *Appeals for the Seventh Circuit*